Page 1

```
1              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
2

3    ELAINE LEVINS and WILLIAM    )
     LEVINS, on behalf of         )
4    themselves and others        )
     similarly situated,          )
5                                 )
                                  )
              Plaintiffs,         )
6                                 )
         vs                       )DEPOSITION OF:
7                                 )DAVID M. FRIEDLANDER
     HEALTHCARE REVENUE RECOVERY  )
8    GROUP, LLC d/b/a ARS ACCOUNT )
     RESOLUTION SERVICES, and     )
9    JOHN AND JANE DOES 1 THROUGH )
     25,                          )
10                                )
              Defendants.         )
11                                )
```

          TRANSCRIPT of the stenographic notes of
the proceedings in the above-entitled matter, as
taken by and before KATHLEEN SWENOR, a Registered
Professional Reporter, Certified Court Reporter
and a Notary Public of the State of New Jersey,
held at the offices of MARKS O'NEILL O'BRIEN
DOHERTY & KELLY, PC, 535 Route 38 East, Cherry
Hill, New Jersey on October 24, 2019, commencing
at 10:00 in the morning.

800-227-8440                                    973-410-4040

EXHIBIT F

- David Friedlander -

Page 50

1  A.  I'm not sure. I believe its contract
2  is between HRRG and Nordis.
3  Q.  Is the contract between ARS and Nordis?
4  A.  No.
5  Q.  Refer -- I know it's somewhat small,
6  the first line in the body of the letter. It's
7  actually the first sentence. I'll read it. It
8  says, "The healthcare creditors," and it has the
9  letter S in parenthesis, "shown below hired ARS
10 Account Resolution Services," then an open paren,
11 ARS, close paren, "to collect the balance due."
12     Do you see that?
13 A.  Yes.
14 Q.  Who is ARS Account Resolution Services?
15 A.  ARS is a business unit, a division of
16 HRRG.
17 Q.  I want to be specific here because the
18 letters ARS in parenthesis right after ARS Account
19 Resolution Services --
20 A.  Yes.
21 Q.  -- signals that the letters "ARS" are
22 going to be used in this letter to refer to ARS
23 Account Resolution Services; correct?
24     MR. SCHEUERMAN: You are talking about
25 the first sentence in ARS4, to clarify?

Page 51

1       MR. STERN: Who are you clarifying it
2   for?
3       MR. SCHEUERMAN: To me.
4       MR. STERN: If he doesn't understand
5   the question he can ask me. It's improper
6   for you to be signaling to the witness
7   there's something he should be cautious about
8   my question.
9       MR. SCHEUERMAN: It wasn't any type of
10  signal.
11 A.  The use of ARS in parenthesis in that
12 first line of the first sentence in this letter is
13 just to clarify in the remainder of the text of
14 the letter that we may use just the initials ARS
15 to mean ARS Account Resolution Services.
16 Q.  Right.
17 A.  In much the same way as when you say,
18 you are referring to HRRG rather than saying
19 Healthcare Revenue Recovery Group, you would just
20 use HRRG.
21 Q.  I understand. I think there's a subtle
22 difference that we don't need to get into right
23 now between -- even though it's subtle it may be
24 very significant between the two examples. But
25 yes, I agree that it's a signal that these three

Page 52

1  letters are going to refer to the longer version,
2  right; for whatever reason, convenience, save
3  space, right, it doesn't matter?
4  A.  Yeah, it's like a short form.
5  Q.  Exactly. It's a short form. Agreed.
6  And I agree to that extent that your example of
7  HRRG is correct that it's a short form of doing
8  it. I understand that's why it's there.
9       It's probably a good time to go back to
10 D-1 now. Because the second item on D-1 is
11 alternate name; do you see that?
12 A.  Yes.
13 Q.  And do you see that I had put there ARS
14 Account Resolution Services; do you see that?
15 A.  Yes.
16 Q.  And if you want in D-2 you can go back
17 to page 3, you'll see at paragraph 3 on page 3 it
18 refers to alternate name and says ARS Account
19 Resolution Services; do you see that?
20 A.  Yes.
21 Q.  And I have copied and pasted that page
22 3 paragraph 3 onto D-1; do you see that?
23 A.  Yes.
24 Q.  Do you have an understanding of what's
25 meant by an alternate name in the context of

Page 53

1  ARS03, the document -- that document?
2  A.  I'm not sure I do.
3  Q.  If I were to say to you that ARS03 is a
4  document that is filed with the State of New
5  Jersey that is a public record that identifies
6  that the name ARS Account Resolution Services is a
7  name that will be used to identify Healthcare
8  Revenue Recovery Group, LLC, does that refresh
9  your recollection at all in terms of what --
10      MR. SCHEUERMAN: Object to form.
11      Counsel is testifying as to the document, not
12      pointing to any facts in the record to
13      support what he just said.
14      MR. STERN: Object to the form, that's
15      fine.
16 A.  The question again that you are asking
17 is?
18 Q.  I'm trying to see if I can refresh your
19 recollection with information about -- let me say
20 this, my understanding from materials that your
21 counsel has submitted to in this case --
22      MR. SCHEUERMAN: What materials?
23      MR. STERN: Excuse me?
24      MR. SCHEUERMAN: Objection to form.
25      He's misstating evidence.

14 (Pages 50 - 53)

- David Friedlander -

Page 70

1  defendant as an abbreviation of ARS Account
2  Resolution Services. ARS Account Resolution
3  Services is the alternate name as shown on
4  ARS03. So all that says is abbreviation of
5  alternate name ARS. So there's no two
6  alternate names on here. There is an
7  alternate name and the abbreviation of
8  alternate name. He already said ARS is a
9  shortened form of or short name or a
10 shortening of ARS Account Resolution
11 Services.
12     MR. SCHEUERMAN: The question was
13 confusing because it was unclear what you
14 were referring to when you said the alternate
15 name. Moreover --
16     MR. STERN: If the question is
17 confusing it's not for you to identify it as
18 confusing.
19     MR. SCHEUERMAN: It's an objection.
20 And I said ambiguous. I have to make that
21 objection or it's waived.
22     MR. STERN: You can make an objection
23 as to form.
24     MR. SCHEUERMAN: I didn't tell him not
25 to answer. I made a form objection.

Page 71

1     MR. STERN: I didn't say that. When
2  you say it's ambiguous or confusing to you,
3  it signals to the witness that the witness
4  should be careful that -- the witness may not
5  think it's ambiguous. The witness may think
6  it's crystal clear. But now the witness's
7  counsel told him, Look out, that question is
8  ambiguous.
9     MR. SCHEUERMAN: Under the rules I have
10 to say the basis for the form objection to
11 give you an opportunity to amend it.
12     MR. STERN: Not unless I ask you for
13 it. You also cannot, as I read in the
14 guidelines from Hall versus Clifton, you
15 cannot give objections which signal to the
16 witness anything about responding to the
17 question.
18     MR. SCHEUERMAN: It didn't. All I said
19 was the basis for the form of the objection.
20     MR. STERN: I disagree.
21     MR. SCHEUERMAN: Can we bring him back
22 in?
23     MR. STERN: What's your --
24     MR. SCHEUERMAN: You can ask him
25 anything you want.

Page 72

1     MR. STERN: I don't understand what
2  your problem is.
3     MR. SCHEUERMAN: Your question that you
4  asked him, it was unclear what you meant by
5  alternate name. So maybe you can walk him
6  through that.
7     MR. STERN: If he doesn't understand
8  the question, and I have no problem giving
9  the instruction again. The witness seems to
10 have no problem if I'm not accurately stating
11 something of telling me that or saying it's
12 not clear or he doesn't understand. If he
13 doesn't understand it's not for you to raise
14 an objection to signal to him to say he
15 doesn't understand.
16     MR. SCHEUERMAN: I have to raise an
17 objection if it's a bad question.
18     MR. STERN: You can object to form. If
19 I want to rephrase it I may ask you to
20 explain why -- what the problem with the form
21 is. But you have preserved your objection by
22 saying objection to the form.
23     MR. SCHEUERMAN: I will make the
24 objections as I see fit and interpret the
25 rules.

Page 73

1     MR. STERN: You can make any objections
2  you want. But if they are outside the bounds
3  of the guidelines then it's not proper.
4     Let's take a five-minute break.
5     (Whereupon there was a recess in the
6  proceedings from 12:07 to 12:09 p.m.)
7  BY MR. STERN:
8     Q. Is there someone at HRRG who is in
9  charge of the management of this lawsuit?
10    A. Yes. Me.
11    Q. Is there anyone that you have to report
12 to with respect to the management of this case?
13    A. No.
14    Q. What I understood in your response to
15 my question about whether ARS is named in the
16 contract between HRRG and Genesis, I was left with
17 the impression that ARS is not all of HRRG. Is
18 ARS -- is referring to ARS refer to HRRG as the
19 entire company?
20    A. No.
21    Q. What does ARS do that the rest of HRRG
22 does not do?
23    A. ARS performs collection services
24 related to more severely delinquent accounts,
25 older accounts than the accounts HRRG collects

19 (Pages 70 - 73)

- David Friedlander -

Page 74

1 for.
2   Q.   Are the employees of HRRG -- excuse me,
3 withdrawn.
4        Are the employees of ARS separate and
5 distinct from employees of HRRG?
6   A.   Yes.
7   Q.   Does ARS occupy space that is separate
8 and apart from space occupied by HRRG? And by
9 "space," I mean like office space where it
10 conducts its business.
11  A.   Yes. It's contiguous space. It's in
12 the same building and area within the building,
13 but it is not -- it's a separate space.
14  Q.   And it has its own structure of
15 hierarchy of management?
16  A.   Yes.
17  Q.   You are president of HRRG; correct?
18  A.   Yes.
19  Q.   And so that includes HRRG of which part
20 of that is ARS?
21  A.   Yes.
22  Q.   I would assume that there are multiple
23 ways to measure the size of a debt collection
24 business; by that, just for instance, number of
25 accounts, total of balances that are due on

Page 75

1 accounts, total amount that's actually collected
2 at any given period. Would you agree those are
3 different ways that one could measure the size of
4 a debt collection business?
5   A.   Yes.
6   Q.   Okay. Is there a way to measure the
7 size of the business that ARS does compared to the
8 remainder of what HRRG does?
9   A.   Yes.
10  Q.   How would you do that?
11  A.   There's a separation of accounts that
12 are placed in collections with HRRG as opposed to
13 the accounts placed with ARS. So the results of
14 the two business units could be measured
15 separately based on the placement of those
16 accounts.
17  Q.   Are they, in fact, measured separately?
18  A.   Yes.
19  Q.   Do you know -- can you relate either by
20 way of percentages or fractions of how much
21 overall HRRG's business is ARS's business?
22  A.   Yes, I could estimate. It would be a
23 very rough estimate.
24  Q.   If you -- with that understanding, what
25 would that estimate be?

Page 76

1   A.   I would estimate ARS to be about a
2 third the size of HRRG.
3   Q.   And if you wanted to know more
4 specifically or a more accurate number, what would
5 you look at? Are there documents, records, or
6 reports that you could look at to get a more
7 accurate number?
8   A.   Yes.
9   Q.   What are those documents that you would
10 look at?
11  A.   They would -- there are multiple
12 documents that would house that information, but
13 the financials.
14  Q.   How often are the financials prepared?
15  A.   They are updated monthly. There are
16 separate reports that are run each month end.
17  Q.   So you could take -- for any given
18 month you could take the reports for that month
19 and have a fairly accurate number of what
20 percentage of HRRG's business is ARS?
21  A.   Yes.
22  Q.   And when you are roughly estimating a
23 third, month to month would -- you know, to what
24 extent do you think that would vary off of that
25 rough estimate, or would it stay pretty much in

Page 77

1 that range?
2   A.   It would stay pretty much in that
3 range.
4   Q.   So it doesn't fluctuate that much? It
5 doesn't fluctuate greatly?
6   A.   No.
7   Q.   Obviously "greatly" is a loose term,
8 but okay.
9        Are all of the accounts that ARS
10 attempts to collect accounts that are transferred
11 from the other side of HRRG's business?
12  A.   I'm not sure. Could you explain what
13 you mean by "the other side of HRRG's business"?
14  Q.   Sure. From what I understood from your
15 testimony is that ARS addresses the more severely
16 delinquent accounts; is that a fair statement?
17  A.   Yes.
18  Q.   Do accounts get placed directly with
19 ARS or do they get placed with HRRG, and then once
20 the account is evaluated for the severity of their
21 delinquency then the more severe ones are placed
22 with ARS?
23  A.   The accounts are first placed with
24 HRRG.
25  Q.   Because they are not delinquent yet?

20 (Pages 74 - 77)

- David Friedlander -

Page 174

1  A. There were two.
2  Q. So one on the HRRG side and one on the
3  ARS side?
4  A. No, two on the HRRG side.
5  Q. Okay. And they handle -- that includes
6  both formal complaints that they get served?
7  A. Yes. They are handling complaints that
8  come in the mail and complaints that come through
9  the CFPB or the Better Business Bureau complaints.
10  Q. But any complaints about your conduct?
11  A. Yeah. Nonlegal complaints.
12  Q. Okay.
13  A. Legal complaints are treated
14  differently.
15  Q. How are legal complaints handled?
16  A. Those are sent to the paralegal I
17  mentioned, Kim Durr, and she handles them. She
18  notifies the appropriate people that there was a
19  legal complaint received. She notifies our errors
20  and omissions insurance carrier.
21  Q. Okay. If you wanted to find out if
22  anyone has made a complaint about the phone
23  messages saying just the standing alone ARS, how
24  would you find that out?
25      MR. SCHEUERMAN: You are talking

Page 175

1  informal complaint, or pleading, a lawsuit?
2      MR. STERN: I'm talking about both.
3  All of them.
4  A. I would go probably through Kim Durr
5  and ask her to look to see.
6  Q. And have you done that in this case?
7  Let me withdraw that. Don't answer that yet.
8      Are you aware of any complaints, formal
9  or otherwise, that have raised the claims that are
10  raised in this case?
11  A. No.
12  Q. Have you asked Kim Durr about whether
13  there are -- have been other cases?
14      MR. SCHEUERMAN: I'm going to object.
15  Kim Durr is a paralegal. She works for a
16  corporate attorney. So to the extent you are
17  getting into what conversations you had,
18  that's protected by attorney-client
19  privilege.
20      MR. STERN: I haven't asked what she
21  said. I asked if he has made the inquiry,
22  that's all I --
23      MR. SCHEUERMAN: You can ask that. But
24  just so everyone is clear.
25  A. I don't think I've asked Kim Durr

Page 176

1  specifically that.
2  Q. Okay.
3      MR. STERN: Pass the witness. Do you
4  have questions?
5      MR. SCHEUERMAN: I have a couple follow
6  ups.
7  BY MR. STERN:
8  Q. David, there are instances in which
9  debt collector representatives from the ARS wing
10  of the company have phone communications with
11  consumers, yes or no?
12  A. Yes.
13  Q. And do you classify those people as --
14  what do you call them, agents, debt collectors?
15  A. I call them agents or representatives.
16  Q. Okay. And if you know, how -- when
17  there's an actual phone conversation, how are
18  those people trained to identify Account
19  Resolution Services on the telephone?
20  A. They are trained to use ARS.
21  Q. Again, this is just during phone calls.
22  What's the reason behind during a phone call just
23  using ARS?
24  A. They are talking to consumers and
25  potentially non-consumers, so potentially people

Page 177

1  who don't have accounts in collections. And using
2  ARS doesn't disclose the nature of the call until
3  we have had a chance to identify that we are
4  speaking with an actual debtor.
5  Q. Okay. The telephone message that's
6  referenced in D-4, you were asked by counsel when
7  you first started using it. You weren't able --
8  were not able to give a specific date. But do you
9  have an approximation when that message was --
10  when the company started using that message?
11  A. I could tell you approximately in -- I
12  think it's the message that we started using when
13  we first started calling on behalf of ARS.
14  Q. Okay. When was that?
15  A. Around 2009.
16  Q. Okay. So you referenced -- when you
17  were talking about the vendor Genesis, you said
18  something that they do speech analytics software.
19  What exactly is that? Can you explain that to me?
20  A. It is software that is able to use
21  speech recognition and can analyze large volumes
22  of call conversations and put them into -- store
23  them in electronic file folders that can be
24  brought up through queries that we can --
25  Q. That --

- David Friedlander -

Page 178

1  A.  So it makes the conversations more
2  useable for training, quality assurance, and
3  finding particular topics within the calls --
4  within the call recordings.
5  Q.  Do you have a quality control program
6  where executives in the HRRG company listen to
7  past recorded calls from agents?
8  A.  Yes.
9  Q.  Have you ever taken part in listening
10 to any past recorded calls relating to calls made
11 on behalf of ARS debts?
12 A.  Yes.
13 Q.  Okay.  What name is typically used by
14 those agents on the telephone when referring to
15 Account Resolution Services?
16 A.  They refer to it commonly as ARS.
17 Q.  Then you were asked a couple of times
18 with certain vendors -- strike that.
19     MR. SCHEUERMAN:  I have nothing
20 further.
21     MR. STERN:  I have some follow-up
22 things that your counsel asked you about.
23 BY MR. STERN:
24 Q.  If I understood, you said that the
25 agents are trained that when they are involved in

Page 179

1  a live call that they just use ARS until they know
2  they are actually speaking with the debtor; is
3  that -- did I understand your testimony?  Is that
4  your testimony?
5  A.  Yes.
6  Q.  Once they -- I think earlier we talked
7  about -- when I was asking you. I think you
8  talked about a term you used was "right person."
9  A.  Yes.
10 Q.  Same meaning, right, the debtor?
11 A.  Right party identification.
12 Q.  That's right, you said right party not
13 right person.
14     Once the agent determines that they are
15 speaking to the right party, do they mention the
16 full name ARS Account Resolution Services anytime?
17 A.  Typically not.  They use ARS for the
18 most part.
19 Q.  Are there training manuals that govern
20 what this issue -- or training materials I should
21 say.  I don't want to limit it to manuals.  Any
22 kind of written materials about what name is to be
23 used in telephone conversations?
24 A.  There are.  There are memos that are
25 used, there are materials they access that are

Page 180

1  electronic and stored in directories that are
2  accessible to staff.
3  Q.  Just to be clear, when we are talking
4  about agents, are we talking about only the agents
5  that work for the ARS business unit use those
6  terms, correct; in other words, used the term ARS
7  in their phone calls?
8  A.  Yes.  I'm talking specifically about
9  agents working on behalf of ARS.
10 Q.  Okay.  And the agents that -- the other
11 agents who work for HRRG don't refer to ARS at
12 all; correct?  Rephrase that.  Do they refer to
13 ARS -- withdrawn.
14     Do the agents employed by HRRG who are
15 not working for ARS receive any training on using
16 either ARS or ARS Account Resolution Services in
17 their telephone communications with consumers?
18 A.  No.
19 Q.  Were you involved in the creation or
20 approval of the script that was used to create the
21 message that was involved here?
22 A.  Yes.
23 Q.  What role -- you were not president at
24 the time, right?  Correct?
25     MR. SCHEUERMAN:  I'm sorry.  What --

Page 181

1  objection to form.  Do you want me to have
2  him go out?  It's one word I'm going to use.
3     MR. STERN:  I'll rephrase the question.
4     MR. SCHEUERMAN:  Thank you.
5  BY MR. STERN:
6  Q.  I think you testified in response to
7  your counsel's question that the message that was
8  used here was a message that started being used in
9  2009; is that correct?
10 A.  Yes.
11 Q.  I thought you testified you had been
12 president for six years?
13 A.  2013 I think I became president.
14 Q.  So the last six years.  And prior to
15 that you were vice-president.  So you were
16 vice-president at the time that the message was
17 started to be used?
18 A.  Yes.
19 Q.  So what role did you play with respect
20 to either the development or approval of the
21 message?
22 A.  I worked with the assistant
23 vice-presidents in creating the message.
24 Q.  Who else was involved in creating the
25 message?

Veritext Legal Solutions
800-227-8440                                                                 973-410-4040