Page 1

1          UNITED STATES DISTRICT COURT
             DISTRICT OF NEW JERSEY
2
                                )
3    ELAINE LEVINS and WILLIAM   )
     LEVINS, on behalf of        )
4    themselves and others       )
     similarly situated,         )
5                                )
             Plaintiffs,         )
6                                )
        vs                       )DEPOSITION OF:
7                                )DAVID M. FRIEDLANDER
     HEALTHCARE REVENUE RECOVERY )
8    GROUP, LLC d/b/a ARS ACCOUNT )
     RESOLUTION SERVICES, and    )
9    JOHN AND JANE DOES 1 THROUGH )
     25,                         )
10                               )
             Defendants.         )
11                               )
     _____
12
13
14
15
16           TRANSCRIPT of the stenographic notes of
17   the proceedings in the above-entitled matter, as
18   taken by and before KATHLEEN SWENOR, a Registered
19   Professional Reporter, Certified Court Reporter
20   and a Notary Public of the State of New Jersey,
21   held at the offices of MARKS O'NEILL O'BRIEN
22   DOHERTY & KELLY, PC, 535 Route 38 East, Cherry
23   Hill, New Jersey on October 24, 2019, commencing
24   at 10:00 in the morning.
25

**Exhibit 1**          **page 1 of 183**

```
                                              Page 2

 1    A P P E A R A N C E S:

 2

 3    STERN THOMASSON, LLP
      BY:   PHILLIP D. STERN, ESQ.

 4    150 Morris Avenue, 2nd Floor
      Springfield, New Jersey 07081

 5    973-379-7500
      Phillip@sternthomasson.com

 6    Attorneys for Plaintiffs

 7

 8
      MARKS O'NEILL O'BRIEN DOHERTY & KELLY, PC

 9    BY:   CHRISTIAN SCHEUERMAN, ESQ.
      535 Route 38 East, Suite 501

10    Cherry Hill, New Jersey 08002
      856-663-4300

11    Cscheuerman@moodklaw.com
      Attorneys for Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit 1**                          **page 2 of 183**

Page 3

1                    I N D E X

2

3    WITNESS                          PAGE

4    David Friedlander

5    BY MR. STERN............................4

6    BY MR. SCHEUERMAN......................176

7    BY MR. STERN...........................179

8

9

10                   E X H I B I T S

11   NO.        DESCRIPTION           PAGE

12   D-1, Term definitions...................16

13   D-2, Document Bates-stamped

14   ARS1 through ARS12......................19

15   D-3, Responses to interrogatories........55

16   D-4, Transcript of message...............139

17   D-5, Court's decision...................166

18

19

20

21

22

23

24

25

Veritext Legal Solutions

**Exhibit 1**        **page 3 of 183**

- David Friedlander -

Page 4

```
1   DAVID FRIEDLANDER,
2   having been first duly sworn by the Notary Public,
3   was examined and testified as follows:
4   EXAMINATION BY
5   MR. STERN:
6        Q.    Mr. Friedlander, can you state your
7   full name and spell your last name for the record,
8   please.
9        A.    Yes.  David M. Friedlander,
10  F-R-I-E-D-L-A-N-D-E-R.
11       Q.    My name is Phillip Stern.  I'm one of
12  the attorneys representing Elaine Levins and
13  William Levins in connection with a lawsuit that
14  they brought against Healthcare Revenue Recovery
15  Group, LLC.
16            Do you have some understanding as to
17  what that lawsuit is about?
18       A.    Yes.
19       Q.    Before we begin there's going to be
20  some instructions I would like to be able to
21  inform you about in terms of the deposition.  At
22  one point in this case Mr. Scheuerman, on behalf
23  of Healthcare Revenue Recovery Group, and I, on
24  behalf of the plaintiffs, agreed that depositions
25  should be held in accordance with -- there's a
```

**Exhibit 1**                              **page 4 of 183**

- David Friedlander -

Page 5

1   court decision from 1993 that outlined some rules

2   with respect to that.  The case is called Hall

3   versus Clifton Precision.  So there's some things

4   that are to be read to inform you at the beginning

5   of the deposition, so I'm going to do that quoting

6   from that decision.

7           Number one, "At the beginning of the

8   deposition deposing counsel shall instruct the

9   witness to ask deposing counsel, rather than the

10  witness's own counsel, for clarifications,

11  definitions, or explanations of any words,

12  questions, or documents presented during the

13  course of the deposition.  The witness shall abide

14  by these instructions."

15          Do you understand that instruction?

16      A.    Yes.

17      Q.    Two, "All objections except those which

18  would be waived if not made at the deposition

19  under Federal Rules of Civil Procedure

20  32(d)(3)(b).

21          MR. SCHEUERMAN:  Federal rules of

22      evidence.

23          MR. STERN:  I'm sorry.

24          MR. SCHEUERMAN:  Federal Rules of

25      Evidence.

**Exhibit 1**                     **page 5 of 183**

- David Friedlander -

```
 1            MR. STERN:  What's Federal Rules of
 2       Evidence?
 3            MR. SCHEUERMAN:  Federal rule 32(d)(b).
 4            MR. STERN:  You're saying it's a
 5       Federal Rule of Evidence?
 6            MR. SCHEUERMAN:  That's what the
 7       decision said.
 8            MR. STERN:  Mine said Federal Rules of
 9       Civil Procedure.  I'm not aware of a Federal
10       Rule of Evidence 32.
11            MR. SCHEUERMAN:  I have a Federal Rule
12       of Evidence right here.
13            MR. STERN:  Federal Rule 329(d)?
14            MR. SCHEUERMAN:  Actually, I'm sorry,
15       no.  You are right.  No, you are right.
16       Federal rules.  You are right.  I'm sorry.
17       Go ahead.  My apologies.
18            MR. STERN:  I'm going to restart.
19  BY MR. STERN:
20       Q.    Paragraph two says, "All objections
21  except those which would be waived if not made at
22  the deposition under Federal Rules of Civil
23  Procedure 32(d)(3)(b), and those necessary to
24  assert a privilege to enforce a limitation on
25  evidence directed by the court or to present a
```

**Exhibit 1**                                    **page 6 of 183**

- David Friedlander -

1  motion pursuant to Federal Rules of Civil

2  Procedure 30(d) shall be preserved; therefore,

3  those objections need not and shall not be made

4  during the course of depositions."

5          Three, "Counsel shall not direct or

6  request that a witness not answer a question

7  unless that counsel has objected to the question

8  on the ground that the answer is protected by a

9  privilege or a limitation on evidence directed by

10  the court."

11          Four, "Counsel shall not make

12  objections or statements which might suggest an

13  answer to a witness.  Counsel statements when

14  making objections should be succinct and verbally

15  economical stating the basis of the objection and

16  nothing more."

17          Five, "Counsel and their witness,

18  clients shall not engage in private off-the-record

19  conferences during the depositions or during

20  breaks or recesses except for the purpose of

21  deciding whether to assert a privilege."

22          Do you understand that, instruction

23  number five?

24      A.    Yes.

25      Q.    Number six, "Any conferences which

**Exhibit 1**                    **page 7 of 183**

- David Friedlander -

Page 8

1   occur pursuant to or in violation of guideline

2   five are a proper subject for inquiry by deposing

3   counsel to ascertain whether there has been any

4   witness coaching and, if so, what."

5            Seven, "Any conferences which occur

6   pursuant to or in violation of guideline five

7   shall be noted on the record by counsel who

8   participated in the conference.  The purpose and

9   outcome of the conference shall also be noted on

10  the record.  Deposing counsel shall provide to the

11  witness's counsel a copy of all documents shown to

12  the witness during the deposition.  The copy shall

13  be provided either before the deposition begins or

14  contemporaneously with the showing of each

15  document to the witness.  The witness and

16  witness's counsel do not have the right to discuss

17  documents privately before witness answers

18  questions about them."

19            And number nine, "Depositions shall

20  otherwise be conducted in compliance with the

21  opinions which accompanies this order."

22            I don't expect you will know what

23  number nine is because I have not provided you the

24  opinion to read.

25            With respect to those first eight

**Exhibit 1**              **page 8 of 183**

- David Friedlander -

1   instructions, are there any questions you have

2   about them or anything you did not understand?

3        A.    Two I didn't really understand.  If you

4   could go over that and maybe explain that.

5        Q.    Okay.  That talks about objections

6   raised by your counsel and the limitations on what

7   objections can be made.  That direction -- that

8   guideline is really more guided towards what your

9   counsel's behavior is as opposed to you and the

10  answers you must give.

11       A.    Okay.

12       Q.    It has to do with what objections are

13  reserved automatically and what objections must be

14  raised during the deposition in order to be

15  preserved.

16       A.    Okay.  Other than that, I'm okay.

17       Q.    Okay.  Particularly talking about the

18  need to speak with counsel during the course of

19  the deposition, is there -- before we begin the

20  deposition -- let me start over.

21            With regard to the guidelines

22  concerning your ability to confer with counsel

23  once the deposition is underway, you understand

24  it's very limited.  You can only discuss with your

25  counsel any issues as to a privilege that you

**Exhibit 1**          **page 9 of 183**

- David Friedlander -

1   might assert; do you understands that?

2        A.    Yes.

3        Q.    So before we begin the deposition,

4   would you like the opportunity to be able to

5   confer with your counsel privately?

6        A.    Before we start?

7        Q.    Yes.

8        A.    No, it's not necessary.

9        Q.    Okay.  But you understand once we start

10  your ability to request a conference with your

11  counsel is limited to issues regarding whether you

12  have a privilege to not provide information?

13       A.    Yes.

14       Q.    Do you understand you are appearing for

15  depositions to answer questions both as to your

16  own personal knowledge of facts and as an

17  authorized representative of Healthcare Revenue

18  Recovery Group, LLC?

19       A.    Yes.

20       Q.    What is your understanding of what this

21  lawsuit is about?

22       A.    The Levins are contending they didn't

23  know who ARS was when they received information

24  about a debt that was owed.

25       Q.    When you say "they received

**Exhibit 1**          **page 10 of 183**

- David Friedlander -

Page 11

1    information," do you know what information they

2    received?

3        A.    I don't know what information might

4    have made them unclear as to the company that was

5    collecting on behalf of the physicians, so I don't

6    know what it was that led to the unclarity.  I

7    believe it was a phone call that they received.

8        Q.    Did you do anything in preparation for

9    the deposition today?

10       A.    Yes.

11       Q.    What did you do?

12       A.    I reviewed the account information in

13   our account notes; I looked at the document that

14   was presented that had the subjects that would be

15   discussed or questions that might be asked during

16   the deposition; I met with counsel to talk about

17   the facts and what I was being deposed about; and

18   I reviewed the information we had received about

19   the deposition today.

20       Q.    Did you speak with anyone, other than

21   counsel, in preparation for the deposition?

22       A.    No.  Oh, maybe internally with Kim

23   Durr, she is a paralegal.

24       Q.    Spell the last name.

25       A.    D-U-R-R.

**Exhibit 1**          **page 11 of 183**

- David Friedlander -

1      Q.    She is a paralegal.  For whom is she

2   employed?

3      A.    She is employed by Healthcare Financial

4   Services and TeamHealth.

5      Q.    When you reviewed the account notes,

6   did they reflect phone calls being placed to the

7   Levins?

8      A.    Yes.

9      Q.    From those account notes, were you able

10  to ascertain any information about the content of

11  those phone calls?

12     A.    Yes.

13     Q.    What were you able to ascertain about

14  the content of those phone calls?

15     A.    The time of the phone calls, the dates

16  of the phone calls, and the conversations that

17  took place in highly abbreviated terms.  There

18  could be notes that are entered by an agent.

19     Q.    What do you mean by the word "agent"?

20  I'm referring specifically -- you used the word

21  agent in your last answer.  I'm asking what do you

22  mean by agent?

23     A.    A representative of Healthcare Revenue

24  Recovery Group or ARS.

25     Q.    When you say "representative," are all

**Exhibit 1**          **page 12 of 183**

- David Friedlander -

```
 1   agents employees?
 2        A.    Yes.
 3        Q.    What's the name of the entity that --
 4   actually, withdraw that.
 5              You made reference before to a debt
 6   which was attempted to be collected from the
 7   Levins.  Do you recall making reference to such a
 8   debt?
 9        A.    Yes.
10        Q.    What's your understanding of what that
11   debt was?
12        A.    Can you clarify the question?
13        Q.    Sure.  What facts do you know about the
14   debt?
15              MR. SCHEUERMAN:  I'm going to -- how is
16        this related to the true name issue?  I'm
17        going to object.
18              MR. STERN:  Are you instructing him not
19        to answer?
20              MR. SCHEUERMAN:  I don't know.  Can you
21        give me a proffer?  Getting into the merits
22        of the debt, how is that relevant to the true
23        name issue?
24              MR. STERN:  I think we had an
25        instruction about what he said, what his
```

**Exhibit 1**          **page 13 of 183**

- David Friedlander -

1      understanding of what the case is about.  I
2      think it would be easier to talk if we had
3      some understanding as to what the debt is.
4           MR. SCHEUERMAN:  But how is that
5      related to the true name issue, whether
6      HRRG -- it's limited, as the judge said,
7      whether -- you know the two issues, so how is
8      that relevant?
9           MR. STERN:  I just said in order to
10     have a discussion about that we need to have
11     some foundational information so that we are
12     on the same page about what we are talking
13     about.
14          MR. SCHEUERMAN:  About what?  About a
15     debt was owed?
16          MR. STERN:  Not about there was a debt
17     owed but some understanding of what the
18     nature of that debt is.
19          MR. SCHEUERMAN:  How is the nature of
20     the debt relevant to --
21          MR. STERN:  I think it will come out
22     because I think -- have your client leave the
23     room.
24          MR. SCHEUERMAN:  Sure.
25          (Witness leaves the room.)

**Exhibit 1**          **page 14 of 183**

- David Friedlander -

1              MR. STERN:  The position has been taken

2     ARS is an unincorporated subdivision of HRRG.

3              MR. SCHEUERMAN:  Okay.

4              MR. STERN:  I don't know what the

5     basis -- why some medical debts are collected

6     by that subdivision and some medical debts

7     are not collected by that subdivision but are

8     being collected by HRRG.  I think that having

9     some understanding of having him describe

10    what the debt is can lead into that.  I'm

11    saying it's foundational in terms of getting

12    to -- talking about and understanding because

13    what the issue is going to come down to is

14    what HRRG's use of the term is.

15             MR. SCHEUERMAN:  Okay.  That's fine.

16             MR. STERN:  So I need to know when.

17             MR. SCHEUERMAN:  You want to know the

18    distinction to see how it's used by HRRG?

19             MR. STERN:  I don't know if it's -- I

20    haven't gotten there yet.  I don't think I

21    have to approach it in a particular order.  I

22    think that -- but I think this is sort of --

23             MR. SCHEUERMAN:  For that issue, then

24    that's fine.

25             MR. STERN:  Okay.  That's all I want to

**Exhibit 1**        **page 15 of 183**

- David Friedlander -

1      do.  We are not getting into the merits of

2      the debt.

3              MR. SCHEUERMAN:  Okay.

4              (Witness returns.)

5  BY MR. STERN:

6      Q.    I'll repeat the question.  The question

7  is, what is your understanding of what the debt is

8  that was allegedly owed by the Levins?

9      A.    It's an obligation to pay money to the

10  physician group that provided, I believe the

11  Levins' daughter, with healthcare services.

12      Q.    HRRG provided the collection services

13  for that physician group; correct?

14      A.    For the company that bills for the

15  physician services.

16              MR. STERN:  Let's mark this as D-1.

17              (Exhibit D-1, Term definitions, marked

18      for identification, as of this date.)

19  By MR. STERN:

20      Q.    Mr. Friedlander, I'm showing what has

21  been marked as D-1.  It's a document that I

22  prepared trying to define some terms.  I make

23  reference --

24              MR. SCHEUERMAN:  I'm going to note this

25      is something that --

**Exhibit 1**          **page 16 of 183**

- David Friedlander -

Page 17

```
 1            MR. STERN:  Hold on.  Are you making an
 2       objection?
 3            MR. SCHEUERMAN:  I object to the form
 4       of the document.  This is not something that
 5       was ever produced in discovery before today.
 6       This is the first time I'm looking at it, and
 7       it was prepared by counsel.  So it's not in
 8       the discovery record.
 9            MR. STERN:  Okay.  Your objection is
10       noted.
11  BY MR. STERN:
12       Q.   So I want to explain it to you, and we
13  can talk about the substance of it, what I did
14  here.  So there's a document that your counsel
15  produced.  The document is marked.  Do you know
16  the term used sometimes as a "Bates stamp"?  Have
17  you ever heard that term?
18       A.   Yes.
19       Q.   And just sort of to cut this, a Bates
20  stamp is a way of paginating documents in a
21  litigation.  It's one of the uses of it by usually
22  having some kind of prefix and digits to follow it
23  that are sequential.  Is your understanding
24  similar or the same?
25       A.   I didn't know in that much detail what
```

**Exhibit 1**              **page 17 of 183**

- David Friedlander -

Page 18

1   a Bates stamp is, but yes.

2        Q.    So I'll represent to you your counsel

3   produced documents that use the ARS prefix, and a

4   document -- a page in those documents called ARS3.

5   And in that document, I'm happy to show it to you

6   if you would like to see it, but -- if you are not

7   familiar with it, but it's a document which

8   identifies, has a field called business name, that

9   I actually, what's on here or shows source.

10               MR. SCHEUERMAN:  I have the documents

11        here.

12               MR. STERN:  No, I'm handling the

13        deposition.  You can't hand him documents in

14        the middle of my examination.

15               MR. SCHEUERMAN:  Okay.

16   BY MR. STERN:

17        Q.    But I have copied and pasted into --

18   under the section called business name the actual

19   portion of that document on ARS3 here.  So I was

20   just using that document referred -- called

21   Healthcare Revenue Recovery Group, LLC, the

22   business name.  I thought it would make sense for

23   purposes of the deposition when we are talking

24   about this because we are talking about names,

25   when we refer to the business name we are talking

**Exhibit 1**          **page 18 of 183**

- David Friedlander -

Page 19

1   about Healthcare Revenue Recovery Group, LLC.  Are

2   you okay if we use that term business name as

3   meaning Healthcare Revenue Recovery Group, LLC?

4        A.    Do you have the document that you

5   said --

6        Q.    Yes.

7              MR. STERN:  Mark this as D-2.

8              (Exhibit D-2, Document Bates-stamped

9        ARS1 through ARS12, marked for

10       identification, as of this date.)

11             MR. SCHEUERMAN:  This has a different

12       Bates stamp number compared to the one -- I

13       have Bates stamp numbers on all of them.  I

14       don't know if there's --

15             MR. STERN:  The one that's

16       Bates-stamped including the account notes?

17             MR. SCHEUERMAN:  Yeah.

18             MR. STERN:  I don't know if they

19       were -- I see what happened.

20             MR. SCHEUERMAN:  They are

21       Bates-stamped.

22             MR. STERN:  I guess what happened is

23       when printing those pages that you produced

24       as the account notes were printed in

25       landscape mode and you put it on that way.

**Exhibit 1**          **page 19 of 183**

- David Friedlander -

Page 20

1       When they printed out from mine as one PDF,

2       because we produced electronically as one

3       PDF, the Bates stamp on those pages of the

4       account notes did not come out.  I have no

5       problem if you want -- if you want to use

6       that.  I don't know if you have extra copies

7       we can print from that.

8               MR. SCHEUERMAN:  This is the one I

9       produced.  I can't -- I haven't gone through

10      and compared it.

11              MR. STERN:  That's fine.

12              THE WITNESS:  I'm okay to use this.

13              MR. STERN:  Let's -- off the record.

14          (Discussion off the record.)

15   BY MR. STERN:

16      Q.    So you have now in front of you D-2.

17   If you turn, you see at the bottom right the first

18   page says ARS01?

19      A.    Yes, I see.

20      Q.    If you go to page 03.

21      A.    Yes.

22      Q.    And you see there's numbered paragraph

23   1?

24      A.    Yes.

25      Q.    And it says business name?

**Exhibit 1**          **page 20 of 183**

- David Friedlander -

```
 1        A.    Yep.
 2        Q.    That's what was cut and pasted --
 3   copied and pasted and put into what I marked as
 4   D-1 --
 5        A.    Yes.
 6        Q.    -- under business name.
 7        A.    Yes, I see.
 8        Q.    While we are on ARS03, do you know what
 9   ARS03 is?
10        A.    It's a photocopy of something from the
11   State of New Jersey.
12        Q.    Okay.  To your knowledge, is the
13   business name which is shown on D-1, specifically
14   Healthcare Revenue Recovery Group, LLC, is that
15   the name of the entity which was collecting the
16   debt from the Levins?
17        A.    Yes.
18        Q.    To your knowledge, is that the legal
19   name of the entity?
20              MR. SCHEUERMAN:  Objection to form.
21        Calls for legal conclusion.  But you can
22        answer.
23        A.    I believe it is.
24        Q.    Do you have some understanding as to
25   what a limited liability company is?
```

**Exhibit 1**          **page 21 of 183**

- David Friedlander -

```
 1        A.    Yes.
 2        Q.    Are you a member of Healthcare Revenue
 3   Recovery Group, LLC?
 4        A.    No.
 5        Q.    Do you know who the members are, member
 6   or members?
 7        A.    No.
 8        Q.    Do you hold a position with Healthcare
 9   Revenue Recovery Group, LLC?
10        A.    Yes.
11        Q.    What's your position?
12        A.    President.
13        Q.    How long have you held that position?
14        A.    For approximately six years.
15        Q.    Have you held any other positions with
16   Healthcare Revenue Recovery Group?
17        A.    Yes.
18        Q.    What other positions have you held?
19        A.    I was vice-president, and prior to that
20   I was assistant -- I think I was director prior to
21   that.
22        Q.    Have each of the positions you
23   described, each of them were full-time positions?
24        A.    Yes.
25        Q.    So you didn't -- at the time that you
```

**Exhibit 1**          **page 22 of 183**

- David Friedlander -

Page 23

1   were president and vice-president and director, at

2   those times you were not -- you didn't have

3   full-time employment somewhere else; correct?

4        A.   Yes.

5        Q.   The earliest position you held was

6   director?

7        A.   Manager.  I was manager prior to

8   director.

9        Q.   So manager was your first position

10  with --

11       A.   Yes.

12       Q.   -- Healthcare --

13            When did you become a manager?

14       A.   I was hired as manager for a different

15  entity named IMBS that later became Healthcare

16  Revenue Recovery Group.  And I was hired in 1996.

17       Q.   How long were you a manager?

18       A.   In the entirety of my career or when I

19  was with --

20       Q.   The position of manager that you were

21  hired for in 1996, how long did you hold that

22  position?

23       A.   I don't recall how many years it was.

24  It was -- I can't recall the dates that I was

25  promoted to director.

**Exhibit 1**        **page 23 of 183**

- David Friedlander -

Page 24

1     Q.    Okay.  At some point you became

2     director?

3     A.    Yes.

4     Q.    You held that position -- do you recall

5     for about how long you held that position?

6     A.    That was approximately two years.

7     Q.    Then you were promoted to

8     vice-president?

9     A.    Yes.

10     Q.    And do you remember when you became

11     vice-president?

12     A.    No.  No.  The years are kind of running

13     together.  I have been with the company a long

14     time.

15     Q.    And do you recall about how long you

16     were vice-president?

17     A.    About nine years.

18     Q.    Then you went from being vice-president

19     to becoming president?

20     A.    Yes.

21     Q.    What's your understanding of --

22     withdrawn.

23          In talking about when you were hired as

24     manager, you said you were hired by IMBS and at

25     some point it became HRRG?

- David Friedlander -

Page 25

1      A.    Yes.

2      Q.    What's your understanding of what that

3  transition was?  To give you a "for instance," to

4  be more clear about my question is, was it simply

5  a change of name?  Was it a merger?  Was it some

6  combination?  What happened that it went from IMBS

7  to HRRG?

8      A.    It was a name change that had more to

9  do with corporate structure than changing the

10  company name for identification purposes.  There

11  were other parts of the billing and collection

12  operation that were part of IMBS that did not have

13  anything to do with the collection agency that we

14  had set out to establish.  The name change was

15  associated with disassociating the collection

16  agency from the billing operations that were part

17  of IMBS.

18      Q.    So did IMBS continue to exist handling

19  billing operations?

20      A.    Yes, I believe so.

21      Q.    And continuing under that name or a

22  different name?

23      A.    Continuing under that name for a period

24  of time.

25      Q.    So the collection services that were

**Exhibit 1**        **page 25 of 183**

- David Friedlander -

Page 26

```
 1   part of IMBS then got segregated out and was put
 2   under the umbrella of HRRG; is that a fair
 3   statement?
 4        A.    You are calling it an umbrella, I
 5   wouldn't call it that under the name of HRRG,
 6   Healthcare Revenue Recovery Group, LLC.
 7        Q.    Do you know who the member or members
 8   are of Healthcare Revenue Recovery Group, LLC?
 9        A.    I don't know.  No, I don't know.
10        Q.    Do you know if any members are natural
11   persons or whether they are, like, a corporation
12   or another LLC -- withdrawn.
13             Is Healthcare Revenue Recovery Group,
14   LLC a subsidiary of another entity?
15             MR. SCHEUERMAN:  I object.  How is this
16        in any way related to the true name issue?
17             MR. STERN:  I need the witness to leave
18        the room.  Sir, please step out.
19             MR. SCHEUERMAN:  Sorry, David.
20             THE WITNESS:  That's okay.
21             (Witness leaves the room.)
22             MR. STERN:  So as I read the
23        interrogatory answers is that, and my
24        investigation of these entities is the issue
25        is whether -- let me get the language
```

- David Friedlander -

Page 27

1    exactly.  Is ARS the name under which
2    Healthcare Revenue Recovery Group usually
3    transacts business.  I need to have some
4    understanding of what the nature and scope of
5    that business is.  There is reference in the
6    interrogatory answers to simply that it began
7    using this name from the start but it doesn't
8    say who began using that name.  And my own
9    investigation suggests that there is a much
10   more elaborate corporate structure.  This is
11   not -- an LLC appears there's an LLC which is
12   simply owned by one or a handful of
13   individuals.  When I say "individuals" I mean
14   natural persons.  And so, therefore, I have
15   to have an understanding of what that is
16   before I can be able to tell is this
17   something that's a name which usually
18   transacts business, I have to understand the
19   nature of the business.
20        MR. SCHEUERMAN:  Judge Williams
21   specifically referenced the corporate
22   organizational number seven, and she said
23   that was too broad.
24        THE WITNESS:  No, she didn't say that.
25        MR. SCHEUERMAN:  She did.  And she said

- David Friedlander -

Page 28

1      you can ask about -- corporate organization

2      is too broad.  Having -- asking about a

3      subsidiary -- why don't you ask him what's

4      ARS?  When did they start using ARS?  You

5      don't have to get into subsidiaries.  It's

6      far afield from the true name issue.  Meaning

7      if you want to ask him what's ARS, how is it

8      different than HRRG, those are the

9      specifics --

10          MR. STERN:  Which number are you

11     referring to?

12          MR. SCHEUERMAN:  Number seven.  She

13     said the corporate --

14          MR. STERN:  She said the corporate

15     organizational management structure of HRRG

16     was fine.

17          MR. SCHEUERMAN:  Was too broad.

18          MR. STERN:  She didn't say that.  When

19     it went to management and oversight

20     responsibilities that that was too broad.

21     Her point was to contrast, part of that was

22     fine and the part of it was not.

23          MR. SCHEUERMAN:  She said the

24     management structure was fine and the rest

25     was too broad.  So I'm going to object to

**Exhibit 1**          **page 28 of 183**

- David Friedlander -

Page 29

```
 1        that.  That's beyond the scope of the order.
 2            I don't understand.  I'm not going to
 3        tell you what to do, but if you want to ask
 4        what's ARS, how is it different than HRRG,
 5        what's the distinction, is this a company,
 6        that's all fair game.  But you're asking
 7        about subsidiaries which --
 8            MR. STERN:  I didn't ask about
 9        subsidiaries.  I'm trying to find out what
10        the business is.
11            MR. SCHEUERMAN:  It's not relevant --
12            MR. STERN:  It is relevant.
13            MR. SCHEUERMAN:  -- to the true name
14        issue.
15            MR. STERN:  How is it not relevant?
16            MR. SCHEUERMAN:  Whether there's a
17        parent corporation or it's a subsidiary, how
18        is that relevant to the true name issue?
19            MR. STERN:  It's for purpose of
20        defining what is the nature of its business
21        so that I can determine -- then I can proceed
22        to find out what name it usually transacts
23        business -- that business under.
24            MR. SCHEUERMAN:  A subsidiary?  HRRG
25        is --
```

**Exhibit 1**          **page 29 of 183**

- David Friedlander -

Page 30

```
 1          MR. STERN:  What subsidiary?
 2          MR. SCHEUERMAN:  You are asking about
 3     is it a subsidiary.  That's what you were
 4     asking.
 5          MR. STERN:  That's all --
 6          MR. SCHEUERMAN:  It's beyond the scope.
 7     She specifically referenced corporate
 8     organization.  So I suggest if you want to
 9     call her let's make a list, let's add this to
10     the list.  There may be other issues, let's
11     make one call rather than waiting.  If you
12     want to agree on an issue that we can bring
13     to her that's fine, let's put it aside and
14     move on.  We will do one call with the
15     objections.
16          MR. STERN:  My view is we will just --
17     the information from -- that's on their
18     website that explains all that information,
19     we will present that in summary judgment and
20     you won't have the ability to respond to it
21     because you are not letting me inquire of
22     this witness.
23          MR. SCHEUERMAN:  It's beyond the scope
24     of the judge's order, whether a parent
25     company owned HRRG.  I don't see how --
```

**Exhibit 1**          **page 30 of 183**

- David Friedlander -

Page 31

1          MR. STERN:  It's for purposes of
2     identifying what that company is and what
3     business they do.
4          MR. SCHEUERMAN:  That's not relevant.
5     It's beyond the scope of the order.
6          MR. STERN:  It helps to define what
7     business HRRG does.
8          MR. SCHEUERMAN:  It's a debt collector.
9     We all know that.  It's beyond the scope.
10     That's my stand, so let's move on.  We can
11     call the judge -- if you want to call her
12     now, I say we wait, there may be other
13     issues.
14          MR. STERN:  Can you mark the last
15     question that he objected to, read that back?
16          (Record read.)
17          MR. STERN:  So if you can tell me --
18     there's been some discussion -- obviously
19     mark that last question.
20          (Witness returns.)
21     BY MR. STERN:
22     Q.    Did Healthcare Revenue Recovery Group,
23     LLC exist prior to the separation of the
24     collection activity from IMBS?
25     A.    Yes.

**Exhibit 1**          **page 31 of 183**

- David Friedlander -

1      Q.    And what kind of business did

2   Healthcare Revenue Recovery Group do prior to the

3   collection activity from IMBS coming into

4   Healthcare Revenue Recovery Group?

5      A.    Start the question again, please.

6      Q.    Let me ask you this, we started off in

7   D-1, which is in front of you, names.  We got so

8   far the first item, the business name.  We have

9   talked about that name.  Is there any reason we

10  can't refer to that when we are stating that name,

11  just refer to it as HRRG?  Is that --

12     A.    No, there's no reason you couldn't

13  refer to it as HRRG.

14     Q.    For purposes of this, if for some

15  reason either in context or in your answering if

16  HRRG means something to you other than Healthcare

17  Revenue Recovery Group, LLC, you'll let me know;

18  but otherwise, we are going to assume when we are

19  saying HRRG that means or that's a substitute for

20  Healthcare Revenue Recovery Group, LLC.  Okay?

21     A.    Okay.

22     Q.    Let's get back to it.  So I don't want

23  to misstate your testimony.  As I understood your

24  testimony so far is that IMBS included debt

25  collection at one point in time.  And that there

**Exhibit 1**          **page 32 of 183**

- David Friedlander -

Page 33

```
 1   came a point in time where the collection
 2   activities of IMBS was transferred to or became
 3   part of what HRRG.  Is that -- am I misstating it?
 4        A.    Yes.  There were multiple functions
 5   happening under IMBS, including both billing and
 6   collections.  There was a desire by the company to
 7   separate those functions into their own individual
 8   business units, one that handled billing and one
 9   that handled collections.  So HRRG was established
10   to house the collection activity that had once
11   been handled -- that had once been part of what
12   was handled by IMBS.
13        Q.    Okay.  And you also testified that
14   prior to the housing of the collection activity,
15   which had formerly been under IMBS, that HRRG was
16   engaged in some form of business.  I think you
17   said --
18        A.    Just establishment of the business for
19   getting a corporate entity established, an LLC
20   established.  So it wasn't -- there was no
21   activity happening prior to the use of the name
22   for the collection operations.
23        Q.    Do you know when HRRG was formed?
24        A.    I believe it was 2004.
25        Q.    And beginning in -- at some point -- it
```

- David Friedlander -

Page 34

1  was formed in 2004.  At some point either in later

2  2004 or thereafter the collection activity of IMBS

3  was taken from IMBS and housed in HRRG; correct?

4      A.    I would say transitioned is probably a

5  better way of putting it.

6      Q.    I'm trying to use housed -- you used

7  housed before.  I was trying to use the same word.

8  So transitioned; right?

9      A.    Yes.

10     Q.    Has the collection activity of any

11 other entity been transitioned into HRRG?

12     A.    No.

13     Q.    With respect to the Levins' debt, how

14 did it come about that that debt was placed with

15 HRRG?

16     A.    After the Levins' account went through

17 an active billing process with HCFS billing

18 company, the Levins' account was part of a

19 selection process that took place based on the

20 account's age to be placed in collections in an

21 electronic data file with accounts that were

22 placed with Healthcare Revenue Recovery, HRRG.

23     Q.    You mentioned HCFS.

24     A.    Healthcare Financial Services.

25     Q.    Is that a -- the Healthcare Financial

**Exhibit 1**          **page 34 of 183**

- David Friedlander -

Page 35

1    Services a generic term or that's a specific

2    entity?

3        A.    It's a specific entity.

4        Q.    Is that an entity that engages in

5    medical billing?

6        A.    Yes.

7        Q.    Is there any relationship or historical

8    relationship between IMBS and Healthcare Financial

9    Services?

10        A.    Yes.

11        Q.    What is that relationship?

12        A.    I think at one time Healthcare

13   Financial Services was the managing member for

14   IMBS or HRRG, the LLC.  I think they were either

15   one or the managing member.  I'm not sure if the

16   LLC had multiple managing members when HRRG was

17   first formed.

18        Q.    Does HRRG only collect

19   healthcare-related debts?

20        A.    Yes.

21        Q.    And does HRRG only receive placement of

22   debts from billing companies?

23        A.    Yes.

24        Q.    To your knowledge, is there any -- are

25   there any billing companies that have no

**Exhibit 1**          **page 35 of 183**

- David Friedlander -

```
 1   affiliation with HRRG who place debts with HRRG?
 2           MR. SCHEUERMAN:  I object.  How is this
 3       relevant to the issues again?
 4           MR. STERN:  I'm trying to define what
 5       the business is and with whom they transact
 6       business.
 7           MR. SCHEUERMAN:  It's beyond the scope.
 8       Objection.
 9           MR. STERN:  With whom they transact
10       business is not beyond the scope.
11           MR. SCHEUERMAN:  With whom, what?  With
12       whom, who?
13           MR. STERN:  With whom HRRG transacts
14       business.
15           MR. SCHEUERMAN:  For what reason?
16           MR. STERN:  I don't know, I'm trying to
17       find out.
18           MR. SCHEUERMAN:  There's got to be a
19       reason.  What's the proffer for that?
20           MR. STERN:  The third circuit said,
21       quote, "The name under which it usually
22       transacts business."
23           MR. SCHEUERMAN:  Okay.
24           Mr. STERN:  I'm trying to find out what
25       business it transacts.
```

**Exhibit 1**          **page 36 of 183**

- David Friedlander -

Page 37

1          MR. SCHEUERMAN:  Who HRRG usually
2     transacts business with, is that what you are
3     trying to get at?
4          MR. STERN:  That's one of the things
5     I'm trying to find out, yes.  And also
6     defining what its business is.
7          MR. SCHEUERMAN:  What HRRG's business
8     is?
9          MR. STERN:  Yes.  Because it seems that
10    there's a deal.
11         MR. SCHEUERMAN:  Ask him that.
12         MR. STERN:  I'm asking the questions
13    the way I'm asking.  That doesn't make the
14    questions not relevant or outside the scope
15    of discovery.
16         MR. SCHEUERMAN:  The proffer of this
17    line is?
18         MR. STERN:  I'm going to have you stop.
19    Mr. Friedlander, I'm going to ask you to
20    leave the room if we are going to discuss the
21    substance of the questions or the testimony.
22         (Witness leaves the room.)
23         MR. SCHEUERMAN:  So I'm clear, the
24    proffer is you are trying to figure out with
25    whom HRRG does business to ascertain whether

**Exhibit 1**        **page 37 of 183**

- David Friedlander -

Page 38

1    they typically use ARS as an acronym; is that

2    what I'm --

3         MR. STERN:  That's what we are going to

4    get to, yeah.

5         MR. SCHEUERMAN:  Okay, that's fine.

6    Why don't you just ask him that, who they

7    usually transact business with?

8         MR. STERN:  I have no problem doing

9    that.  I assumed if I was going to ask that

10   question you were going to tell me that's

11   confidential, you know, who their customers

12   are.  You want me to ask him, I'll ask him

13   that.

14        MR. SCHEUERMAN:  What are you trying to

15   get at, whether they use it with their

16   clients -- whether they use ARS with their

17   clients?

18        MR. STERN:  I want to find out if they

19   use ARS with everybody.

20        MR. SCHEUERMAN:  Why don't you just ask

21   him that?  To me it seems like you are trying

22   to get --

23        MR. STERN:  I'm trying to get the lay

24   of the land first.

25        MR. SCHEUERMAN:  It seems you are

**Exhibit 1**          **page 38 of 183**

- David Friedlander -

Page 39

1      trying to inquire as to things that are not
2      relevant to corporate structure.
3           MR. STERN:  This is not corporate
4      structure.  This is asking him --
5           MR. SCHEUERMAN:  You have been on this
6      line of questioning for almost 45 minutes and
7      we haven't gotten into anything that's
8      germane to the issues.
9           MR. STERN:  I disagree.  We have gotten
10     a lot of good information so far.
11          (Whereupon there was a recess in the
12     proceedings from 10:59 to 11:07 a.m.)
13  BY MR. STERN:
14     Q.   With whom does HRRG -- is there a term
15  that you use to describe as a group the entity or
16  entities who place accounts with HRRG?
17     A.   Is there a term?  I'm --
18     Q.   In my experience with other debt
19  collectors, they refer to the entities that refer
20  the accounts as customers or clients.
21     A.   Clients we would refer to.
22     Q.   As clients?
23     A.   Yeah, as clients.
24     Q.   Who are HRRG's clients?
25     A.   The clients are the billing customers

**Exhibit 1**                    **page 39 of 183**

- David Friedlander -

```
 1    of Healthcare Financial Services, HCFS; and what
 2    they call OSB, outsource billed clients in
 3    addition to those that are owned.
 4         Q.   So I understand, the billing customers
 5    of HCFS, are those healthcare providers?
 6         A.   Yes.
 7         Q.   So it is your understanding that
 8    healthcare providers use the services of HCFS for
 9    billing and then collections if need be?
10         A.   Yes.
11         Q.   HCFS, what you referred to as the OSB
12    clients, are those also billing entities for
13    healthcare providers?
14         A.   They are physician groups providing
15    services to patients with billing services
16    provided by Healthcare Financial Services, HCFS,
17    but not necessarily owned by HCFS's parent.
18              MR. SCHEUERMAN:  Do you have a new
19         sticker?  This is the new D-2.
20    BY MR. STERN:
21         Q.   Does HRRG market itself to potential
22    new clients?
23         A.   No.
24         Q.   I'm not trying to put words in your
25    mouth.  I'm trying to put a description on this.
```

**Exhibit 1**          **page 40 of 183**

- David Friedlander -

Page 41

1    Is it fair to say that HRRG, sort of, does

2    collection work, and it's captive in a sense that

3    it does the work for -- within a corporate

4    structure of related companies?

5         A.    Yes.

6         Q.    And that there is some -- would it be

7    fair to say that the marketing of HRRG services is

8    really encompassed within the billing services for

9    which HCFS seeks to obtain their clients?

10              MR. SCHEUERMAN:  Objection to form.

11        You are misstating what his testimony was.

12              MR. STERN:  He can certainly correct me

13        if I'm wrong.

14              MR. SCHEUERMAN:  You just misstated.

15        He said --

16              MR. STERN:  He can correct me if it's

17        wrong.  It's not for counsel to tell me if I

18        misstated the testimony.

19   BY MR. STERN:

20        Q.    Certainly I'll tell you, Mr.

21   Friedlander, I'm not trying to put words in your

22   mouth.  I'm trying to understand and repeat back

23   to at least have you confirm so I know I

24   understand what your testimony is.  So if I'm

25   misstating it, please, that's not my intent to

**Exhibit 1**          **page 41 of 183**

- David Friedlander -

Page 42

1    either overstate or understate something you said.

2             MR. SCHEUERMAN:  Objection to form.

3        Misstating the client's testimony.

4             MR. STERN:  Mark that objection,

5        please.

6    BY MR. STERN:

7        Q.    I'm trying to understand the business

8    model under which HRRG operates.  And so maybe

9    drawing some inferences from your testimony I want

10   to clarify it so I can move on.

11            HRRG is one business entity among other

12   business entities which offer services to

13   healthcare providers for billing and collections;

14   is that a fair statement?

15       A.    I'm not sure.

16       Q.    Okay.  Well, so I understand it, HRRG

17   does not market itself to get new accounts, but

18   instead gets assigned -- accounts get placed by an

19   entity that, from your testimony as I understand

20   it, is a related entity in some fashion, HCFS?

21       A.    Yes.

22       Q.    And that I know the term "affiliate"

23   can be a somewhat ambiguous term, but there is

24   some affiliation between HRRG and HCFS, whether

25   it's by way of, you know, common ownership or

**Exhibit 1**          **page 42 of 183**

- David Friedlander -

Page 43

1    subsidiary or parent or sister companies, but
2    there's a relationship.  And they work together in
3    providing services to the healthcare providers?
4         A.    Yes.
5         Q.    In HRRG's attempts to collect debts it
6    sends letters to consumers; correct?
7         A.    Yes.
8         Q.    And in HRRG's attempts to collect debts
9    it places calls to consumers; correct?
10        A.    Yes.
11        Q.    Does HRRG use the services of outside
12   vendors for either mailing letters to consumers or
13   placing phone calls to consumers?
14        A.    Yes.
15        Q.    Does it use a mailing vendor for
16   letters?
17        A.    Yes.
18        Q.    Having handled cases like this and
19   having some understanding of what the relationship
20   is, I'm going to try and get through it quickly.
21   So if I'm misstating something that's -- I'm
22   drawing from my general knowledge to see if it
23   applies with HRRG.  That's what these next
24   questions are going to relate to.
25               Is the mailing vendor provided with

**Exhibit 1**          **page 43 of 183**

- David Friedlander -

1   templates of form letters that HRRG uses?

2        A.    Yes.

3        Q.    And is the mail vendor then provided

4   with data to merge into those templates as and

5   when HRRG decides to send letters to consumers?

6        A.    Yes.

7        Q.    That mail vendor is then responsible

8   for printing out the merged document, the form

9   letter, putting it in an envelope and mailing it

10  out; correct?

11       A.    Yes.

12       Q.    And does the mail vendor provide

13  reports back to HRRG which identifies, or the date

14  in which forms were used to send letters?

15       A.    Yes.

16       Q.    Are those reports in an electronic form

17  that then get inputted into the account notes?

18       A.    I don't know that I would call them

19  reports.

20       Q.    Okay.

21       A.    But --

22       Q.    HRRG receives electronic data from the

23  mail vendor; yes?

24       A.    Yes.

25       Q.    Which provides information about the

**Exhibit 1**          **page 44 of 183**

- David Friedlander -

Page 45

```
 1    mailing of the letters that HRRG has requested the
 2    mail vendor to mail?
 3         A.    Yes.
 4         Q.    That electronic data, or some of that
 5    electronic data gets placed into the account notes
 6    for the accounts on which letters were mailed;
 7    correct?
 8         A.    Yes.
 9         Q.    Does the mail vendor -- withdrawn.
10              Is the return address used for those
11    letters an address which goes back to the mail
12    vendor or which goes back to HRRG?
13         A.    Can you state a time frame, because the
14    process has changed over time?
15         Q.    Okay.
16         A.    So there was a time when it may have
17    been handled differently from the way it's handled
18    now.
19         Q.    All right.  Let's talk about the date
20    of -- I understand that there was a letter sent
21    dated November 30, 2015 to the Levins, so we are
22    talking about that.  I don't know how broad a
23    period you need, whether year or season or what.
24         A.    Are you reviewing -- did you get that
25    information from a document that you are --
```

**Exhibit 1**        **page 45 of 183**

- David Friedlander -

```
                                                    Page 46
 1        Q.    Yes.  In fact --
 2        A.    -- referring to as one of the --
 3        Q.    -- in D-2.
 4              MR. SCHEUERMAN:  The letter -- it's not
 5        D-2.
 6   BY MR. STERN:
 7        Q.    It's page 4 in D-2, ARS4.
 8        A.    Yes, I see that.
 9        Q.    That letter is dated November 30, 2015?
10        A.    Yes.
11        Q.    So that's what I'm referring to.
12        A.    Okay.  Now, can you restate the
13   question?
14        Q.    Sure.  Actually withdraw, and maybe we
15   can get back to it.
16              Let's talk about this letter.  Is there
17   anything in this letter that tells you -- that
18   informs you as to what -- identifies which
19   template was used for creating the letter?
20        A.    Yes.
21        Q.    Where is that?
22        A.    In the lower right corner of the
23   letter.
24        Q.    If you can refer to -- is there a
25   specific text you can refer to?
```

**Exhibit 1**          **page 46 of 183**

- David Friedlander -

Page 47

1    A.    It's barely visible.  It says A1, I
2 believe.
3    Q.    Okay.
4    A.    But it's hard to read because it's been
5 reduced in size from what's normal.
6    Q.    All right.  I do see -- and for
7 purposes of the record there's, sort of, like a
8 barcode beneath the address that's in the lower
9 right corner, and then below that and to the right
10 there it says A1.
11    A.    Looks like it says A1, yes.
12    Q.    Looks like that to me as well.
13         What does A1 tell you about the
14 template?
15    A.    A1 would be one of the letter types
16 used by ARS.
17    Q.    Okay.  And the return address that
18 would appear from the outside of the envelope, is
19 that the address that appears in the upper left
20 corner of ARS04?
21    A.    Can you read the address you are
22 referring to, please?
23    Q.    Sure.  It looks like it says PO Box
24 459079, Sunrise, Florida.
25    A.    Yes, that's -- that is the return

**Exhibit 1**          **page 47 of 183**

- David Friedlander -

```
 1    address.
 2         Q.    Okay.
 3              MR. SCHEUERMAN:  Note my objection to
 4        form.  That wasn't the full return address.
 5              MR. STERN:  Okay.
 6    BY MR. STERN:
 7         Q.    So that's the address that would have
 8    appeared from the outside of the envelope;
 9    correct?
10         A.    Yes.
11         Q.    And is that address an address for HRRG
12    or is it an address for the mail vendor?
13         A.    That's an address that would be for
14    ARS.
15         Q.    For ARS?
16         A.    Yes.
17         Q.    We have not talked about ARS yet, but
18    understood.  I understand your answer.  We will
19    dovetail back to that.
20              Looking at ARS04, are you able to tell
21    from whom the letter was sent?  I said that
22    awkwardly.  Who sent the letter?
23         A.    The print mail service.  They are
24    called Nordis, N-O-R-D-I-S.
25         Q.    That's the vendor?
```

Veritext Legal Solutions

800-227-8440                                          973-410-4040

**Exhibit 1**          **page 48 of 183**

- David Friedlander -

Page 49

1        A.    Yes.

2        Q.    How long have they been the mail

3    vendor?

4        A.    I believe since 1997.

5        Q.    So it's not -- it's not like there's a

6    possibility there's another vendor involved?

7        A.    No.

8        Q.    So you said the letter is sent from

9    ARS; correct?

10       A.    I don't recall saying that.

11       Q.    Okay.  The letter was physically sent

12   by Nordis; correct?

13       A.    Yes.

14       Q.    Nordis printed the letter, put it in an

15   envelope and mailed it; correct?

16       A.    Yes.

17       Q.    Nordis did that because it received, in

18   some form, instructions to merge data into the

19   template A1 and mail this letter?

20       A.    Yes.

21       Q.    Does Nordis have a contract governing

22   its relationship with regard to sending these

23   letters?

24       A.    Yes.

25       Q.    With whom does Nordis contract?

- David Friedlander -

Page 50

1        A.    I'm not sure.  I believe its contract
2    is between HRRG and Nordis.
3        Q.    Is the contract between ARS and Nordis?
4        A.    No.
5        Q.    Refer -- I know it's somewhat small,
6    the first line in the body of the letter.  It's
7    actually the first sentence.  I'll read it.  It
8    says, "The healthcare creditors," and it has the
9    letter S in parenthesis, "shown below hired ARS
10   Account Resolution Services," then an open paren,
11   ARS, close paren, "to collect the balance due."
12            Do you see that?
13       A.    Yes.
14       Q.    Who is ARS Account Resolution Services?
15       A.    ARS is a business unit, a division of
16   HRRG.
17       Q.    I want to be specific here because the
18   letters ARS in parenthesis right after ARS Account
19   Resolution Services --
20       A.    Yes.
21       Q.    -- signals that the letters "ARS" are
22   going to be used in this letter to refer to ARS
23   Account Resolution Services; correct?
24            MR. SCHEUERMAN:  You are talking about
25       the first sentence in ARS4, to clarify?

**Exhibit 1**              **page 50 of 183**

- David Friedlander -

Page 51

1          MR. STERN:  Who are you clarifying it

2     for?

3          MR. SCHEUERMAN:  To me.

4          MR. STERN:  If he doesn't understand

5     the question he can ask me.  It's improper

6     for you to be signaling to the witness

7     there's something he should be cautious about

8     my question.

9          MR. SCHEUERMAN:  It wasn't any type of

10     signal.

11     A.    The use of ARS in parenthesis in that

12     first line of the first sentence in this letter is

13     just to clarify in the remainder of the text of

14     the letter that we may use just the initials ARS

15     to mean ARS Account Resolution Services.

16     Q.    Right.

17     A.     In much the same way as when you say,

18     you are referring to HRRG rather than saying

19     Healthcare Revenue Recovery Group, you would just

20     use HRRG.

21     Q.    I understand.  I think there's a subtle

22     difference that we don't need to get into right

23     now between -- even though it's subtle it may be

24     very significant between the two examples.  But

25     yes, I agree that it's a signal that these three

**Exhibit 1**          **page 51 of 183**

- David Friedlander -

Page 52

```
 1   letters are going to refer to the longer version,
 2   right; for whatever reason, convenience, save
 3   space, right, it doesn't matter?
 4        A.    Yeah, it's like a short form.
 5        Q.    Exactly.  It's a short form.  Agreed.
 6   And I agree to that extent that your example of
 7   HRRG is correct that it's a short form of doing
 8   it.  I understand that's why it's there.
 9             It's probably a good time to go back to
10   D-1 now.  Because the second item on D-1 is
11   alternate name; do you see that?
12        A.    Yes.
13        Q.    And do you see that I had put there ARS
14   Account Resolution Services; do you see that?
15        A.    Yes.
16        Q.    And if you want in D-2 you can go back
17   to page 3, you'll see at paragraph 3 on page 3 it
18   refers to alternate name and says ARS Account
19   Resolution Services; do you see that?
20        A.    Yes.
21        Q.    And I have copied and pasted that page
22   3 paragraph 3 onto D-1; do you see that?
23        A.    Yes.
24        Q.    Do you have an understanding of what's
25   meant by an alternate name in the context of
```

**Exhibit 1**          **page 52 of 183**

- David Friedlander -

Page 53

1    ARS03, the document -- that document?

2         A.    I'm not sure I do.

3         Q.    If I were to say to you that ARS03 is a

4    document that is filed with the State of New

5    Jersey that is a public record that identifies

6    that the name ARS Account Resolution Services is a

7    name that will be used to identify Healthcare

8    Revenue Recovery Group, LLC, does that refresh

9    your recollection at all in terms of what --

10              MR. SCHEUERMAN:  Object to form.

11         Counsel is testifying as to the document, not

12         pointing to any facts in the record to

13         support what he just said.

14              MR. STERN:  Object to the form, that's

15         fine.

16         A.    The question again that you are asking

17    is?

18         Q.    I'm trying to see if I can refresh your

19    recollection with information about -- let me say

20    this, my understanding from materials that your

21    counsel has submitted to in this case --

22              MR. SCHEUERMAN:  What materials?

23              MR. STERN:  Excuse me?

24              MR. SCHEUERMAN:  Objection to form.

25         He's misstating evidence.

**Exhibit 1**                    **page 53 of 183**

- David Friedlander -

Page 54

1   BY MR. STERN:

2       Q.    That the document which is ARS03, which

3   is contained in D-2, is a certificate filed with

4   the State of New Jersey which identifies an

5   alternate name for Healthcare Revenue Recovery

6   Group, LLC, and that alternate name is ARS Account

7   Resolution Services.

8            Having said that, is that -- does that

9   refresh your recollection as to the document

10  ARS03?

11      A.    Can you go back to -- can we reread

12  what the initial question was?

13           MR. SCHEUERMAN:  He rephrased it after

14      the initial question.

15  BY MR. STERN:

16      Q.    Let me tell you where I'm at.

17      A.    I thought we were talking --

18           MR. SCHEUERMAN:  I objected and he

19      rephrased.

20  BY MR. STERN:

21      Q.    I want to clarify the question.

22      A.    I thought we were talking about do I

23  understand what an alternate name is.

24      Q.    Maybe -- I apologize if I got off on a

25  tangent instead of dealing with that.  Let's talk

**Exhibit 1**          **page 54 of 183**

- David Friedlander -

Page 55

1    about that.

2            Can you answer that?  Do you have an

3    understanding of what an alternate name is in the

4    context of a document being filed to register an

5    alternate name?

6        A.    And I think I answered I'm not sure.

7    I'm still not sure.

8        Q.    Okay.  Then in terms of -- let's get to

9    D-1.  Let's get to the third thing that I have

10   listed on there, the third and final thing.  I say

11   abbreviation of alternate name and I have there

12   ARS.  And I can point you to -- I haven't

13   identified the document yet, but I can point you

14   to responses to interrogatories.  I guess it would

15   probably make sense to do that.

16           (Exhibit D-3, Responses to

17       interrogatories, marked for identification,

18       as of this date.)

19   BY MR. STERN:

20       Q.    Take a moment and page through, and I'm

21   going to draw your attention to the last page of

22   D-3.

23           MR. SCHEUERMAN:  Take your time and

24       read the document.  Let us know when you are

25       ready.

**Exhibit 1**          **page 55 of 183**

- David Friedlander -

Page 56

1      A.    Yes.  Okay.

2      Q.    All right.  The last page, go to the

3  last page.

4      A.    Yes.

5      Q.    Is that your signature that appears on

6  the last page?

7      A.    Yes.

8      Q.    When was the first time that you saw

9  the document marked D-3?

10     A.    I don't recall the first time I saw it.

11     Q.    Did you understand that D-3 was a

12  document that was prepared by your counsel?

13          MR. SCHEUERMAN:  Objection.  Form.

14     A.    Yes.

15     Q.    Did you review the document which is

16  D-3 in preparation for the deposition today?

17     A.    I believe I reviewed parts of it.

18     Q.    Before you signed D-3, did you review

19  the entire document?

20     A.    Yes.

21     Q.    Did you understand everything that was

22  in D-3 or were you -- to the extent you didn't

23  understand it, did you get -- were you satisfied

24  with -- withdrawn.

25          Did you understand everything that you

**Exhibit 1**          **page 56 of 183**

- David Friedlander -

1   read in D-3 before you signed it?

2        A.    Yes.

3        Q.    Let's move back a little bit.  What's

4   your highest level of education?

5        A.    Bachelor's in business administration.

6        Q.    From where?

7        A.    From Boston University, School of

8   Management.

9        Q.    Prior to your being hired by IMBS, had

10  you worked in the debt collection field?

11       A.    Yes.

12       Q.    When you were hired by IMBS, were you

13  working in debt collection or on the billing side?

14       A.    Debt collection.

15       Q.    What was your experience with debt

16  collection prior to being hired by IMBS?

17       A.    I had worked at a company called Exeter

18  Management on debt collection for multiple clients

19  of theirs.

20       Q.    Were those medical debts or other types

21  of debts?

22       A.    Both.

23       Q.    Was the debt collection consumer debt

24  collection when you worked at Exeter or was it

25  mixed, or was it not?

**Exhibit 1**              **page 57 of 183**

- David Friedlander -

Page 58

1      A.    For the most part it was not consumer

2   debt.  It was -- yeah, it was different types of

3   debt but commercial debt.

4      Q.    Commercial debt?

5      A.    Primarily.

6      Q.    Did you have experience in debt

7   collecting prior to working for Exeter?

8      A.    No.

9      Q.    Can you tell me from when you

10  graduated -- did you attend Boston University

11  full-time?

12     A.    Yes.

13     Q.    From the time you graduated till the

14  time you started at Exeter, did you have other

15  full-time employment?

16     A.    No.

17     Q.    So it was basically once you graduated

18  your --

19     A.    I actually worked part-time at Exeter

20  while I was attending school as a full-time

21  student.

22     Q.    I was asking, given the Exeter name,

23  was it in the Massachusetts area?

24     A.    Yes.  Why, have you heard of it?

25     Q.    No.  Exeter is a city in Massachusetts.

**Exhibit 1**          **page 58 of 183**

- David Friedlander -

Page 59

1    Phillips Academy has an Exeter campus.  The prep

2    school was there, so I assumed that was a New

3    Englander, certainly Massachusetts-based company.

4            When you worked at Exeter, did you

5    reside in Massachusetts or New England?

6        A.    Yes.

7        Q.    And was IMBS located in Florida?

8        A.    Yes.

9        Q.    When you took the job did you move to

10   Florida?

11       A.    I moved to Florida before I took the

12   job?

13       Q.    Have you taken any courses at an

14   educational institution subsequent to graduating

15   from Boston University?

16       A.    No.

17       Q.    Have you taken any seminars offered by

18   the debt collection industry?

19       A.    Yes.

20       Q.    And you have done that with some

21   regularity over the course of your career?

22       A.    Yes.

23       Q.    What I -- when I said "some

24   regularity," do you attend a seminar or conference

25   at least once a year?

- David Friedlander -

Page 60

```
 1        A.    Yes.
 2        Q.    Does HRRG have a general counsel or
 3   in-house counsel?
 4        A.    No.
 5        Q.    Is there a general counsel within any
 6   of the related entities that provides in-house
 7   legal services for HRRG?
 8        A.    Yes.
 9        Q.    Who manages litigations brought under
10   the Fair Debt Collection Act against HRRG?
11             MR. SCHEUERMAN:  Objection to form.
12        I'm sorry, how is that related?  Who manages
13        what?
14             MR. STERN:  I'm trying to find out to
15        make sure I know -- we have -- if there's
16        some other representative we need to talk to.
17        I want to find out basically who manages
18        litigation control.
19             MR. SCHEUERMAN:  At HRRG?
20             MR. STERN:  Either at HRRG or for HRRG
21        within the group of entities.
22             MR. SCHEUERMAN:  What do you mean by
23        "manages"?
24             MR. STERN:  Typically there's -- a
25        corporate counsel will have oversight or will
```

**Exhibit 1**          **page 60 of 183**

- David Friedlander -

Page 61

1      be basically the direct liaison with outside

2      counsel in litigation.

3              MR. SCHEUERMAN:  What's -- the proffer

4      for this is what?

5              MR. STERN:  If you want a proffer I can

6      do it without the witness being present.

7              MR. SCHEUERMAN:  Can you leave?

8              (Witness leaves the room.)

9              MR. SCHEUERMAN:  What's the proffer?

10             MR. STERN:  He's being produced as?

11             MR. SCHEUERMAN:  A 30(b)(6) witness and

12     individual.  What's the proffer?

13             MR. STERN:  Right.  I'm just confirming

14     I was quite frankly expecting him to say he's

15     the one in charge, or you know there's

16     in-house counsel for, you know, HCFS who

17     manages that.  That's all I wanted to know.

18             MR. SCHEUERMAN:  Who manages what?

19             MR. STERN:  Who manages litigation.

20             MR. SCHEUERMAN:  Managing this

21     litigation or what litigation in particular?

22             MR. STERN:  Just the corporate

23     responsibilities, how the responsibilities

24     are divvied out so I have an understanding.

25             MR. SCHEUERMAN:  I think someone -- if

**Exhibit 1**          **page 61 of 183**

- David Friedlander -

Page 62

1     you want to ask him if there's someone

2     managing this litigation for HRRG that's

3     fine, but I'm going to object to someone in

4     general who is managing some other

5     litigation.  That's not relevant to this

6     case.

7          MR. STERN:  I don't know if it's not

8     relevant to this case.

9          MR. SCHEUERMAN:  You can ask him.

10         MR. STERN:  I don't know how many other

11    times they have been -- the same claim that's

12    raised here has been raised by others.

13         MR. SCHEUERMAN:  Why don't you ask him

14    that?

15         MR. STERN:  You say why don't I ask

16    him, you don't get to control how I ask the

17    questions.  I don't have to get to the

18    end-of-the-line question and make me have to

19    ask that first before I can lay the

20    foundation for that.

21         MR. SCHEUERMAN:  I'm going to object.

22    If you are asking him who is managing

23    litigation in general not involved with this

24    case I object.  If you are asking if someone

25    is managing this litigation --

**Exhibit 1**          **page 62 of 183**

- David Friedlander -

Page 63

```
 1              MR. STERN:  Okay.

 2              MR. SCHEUERMAN:  -- then that's a fair

 3        question.

 4              MR. STERN:  When I said okay, I

 5        understand your position.  I'm not assenting

 6        to it.

 7              MR. SCHEUERMAN:  I understand.

 8   BY MR. STERN:

 9        Q.   We have been referring to HRRG and HCFS

10   as being related entities.  Is there a name that

11   you would use that would describe the -- well,

12   before I do that.

13              Are there other entities that are

14   related to HRRG and HCFS in the provision of

15   billing and collection services to healthcare

16   providers?

17              MR. SCHEUERMAN:  I'm going to object.

18        I mean, it's the same -- basically the same

19        question you asked before, is there a

20        subsidiary.  I don't see how any of that is

21        relevant in connection with the discovery

22        order.

23        A.   So answering --

24              MR. SCHEUERMAN:  I object based on that

25        order, the limitation of discovery.  If you
```

**Exhibit 1**          **page 63 of 183**

- David Friedlander -

```
 1        want to mark that we can talk to the judge.
 2             MR. STERN:  Mark that.
 3   BY MR. STERN:
 4        Q.    What is TeamHealth?
 5             MR. SCHEUERMAN:  Again, objection to
 6        form.  Same objection.  Not a form objection.
 7        It's objection based on this order.
 8             Is there a proffer for how it's related
 9        to how the business typically transacts
10        business or is ARS a commonly used acronym?
11             MR. STERN:  Mr. Friedlander, can you
12        please step out.
13             (Witness leaves the room.)
14             MR. SCHEUERMAN:  That question is
15        relating to organization, which the judge
16        specifically said was too broad.
17             MR. STERN:  It's not true, that's not
18        what she said.  I'm not going to argue with
19        you over what she said.  She did not say
20        that.
21             But I have information that suggests
22        that HRRG has held itself out to being a
23        division of an entity called TeamHealth.  As
24        a division of, I don't understand what that
25        means when he says it's a separate entity.
```

**Exhibit 1**          **page 64 of 183**

- David Friedlander -

Page 65

1    I'm trying to find out so I understand what

2    its business is.

3         MR. SCHEUERMAN:  That hasn't been

4    produced in discovery.  What are you

5    referring to?

6         MR. STERN:  I'm referring to some of my

7    own investigation.

8         MR. SCHEUERMAN:  Okay.  It's not

9    related.

10        MR. STERN:  It doesn't matter it's not

11   produced in discovery.

12        MR. SCHEUERMAN:  That's goes to the

13   organization of the company, and I think it's

14   beyond the scope of the discovery order.  If

15   you want to mark that one we can raise that

16   with the judge as well.

17        Can I bring him back in?

18        MR. STERN:  Sure.

19        (Witness returns.)

20   BY MR. STERN:

21        Q.    Is one of HRRG vendors, I don't know if

22   it's pronounced Genesis or Gensis?

23        A.    Genesis.  Yes.

24        Q.    What services does Genesis provide?

25        A.    Genesis, they actually took over a

**Exhibit 1**         **page 65 of 183**

- David Friedlander -

Page 66

1   vendor we used for their speech analytic system

2   called Utopi (ph).  Genesis purchased Utopi.  We

3   use speech analytic software they used to call

4   Speech Minor.  Genesis re-branded it, but that's

5   what we use.

6        Q.    And how is speech analytics used in the

7   debt collection activities of --

8        A.    We use it to analyze our recorded

9   conversations with consumers.  And it categorizes

10  the conversations into topics.

11       Q.    Is there a contract with Genesis for

12  its services?

13       A.    Yes.

14       Q.    And who are the parties to that

15  contract?

16       A.    Genesis and HRRG.

17       Q.    And in that contract does it refer to

18  HRRG as ARS?

19       A.    The contract covers ARS in addition to

20  HRRG.

21       Q.    So let's go back to D-1 for a moment,

22  which was the page with the different names on it.

23  I want to be clear so there's no misunderstanding.

24  We have on that page the alternate name, which

25  comes from that certificate, 03 that's on there,

**Exhibit 1**          **page 66 of 183**

- David Friedlander -

Page 67

1    which is ARS Account Resolution Services?

2         A.    Yes.

3         Q.    When we refer to -- when you are

4    referring to ARS, that's just a shortened version

5    of the alternate name; correct?

6         A.    Yes.

7         Q.    And that alternate name is a name which

8    HRRG uses to identify itself; correct?

9              MR. SCHEUERMAN:  I'm sorry, objection

10        to form.  Ambiguous.  You can answer.

11        A.    No, I don't think that's correct.

12        Q.    Does HRRG use the alternate name?

13             MR. SCHEUERMAN:  I'm going to object.

14        There's alternate names listed twice.  One

15        for -- if you want him to step out, I think

16        the questions are improper.

17             MR. STERN:  Have him step out.

18             (Witness leaves the room.)

19             MR. SCHEUERMAN:  First of all, D-1 is

20        not in evidence, as I said before; it's your

21        document.  But the second item it says

22        alternate name and it says ARS Account

23        Resolution Services.  The one at the bottom

24        also says alternate name ARS.  So when you

25        say "alternate name," I don't think he --

**Exhibit 1**          **page 67 of 183**

- David Friedlander -

```
 1          MR. STERN:  It doesn't say alternate
 2     name.
 3          MR. SCHEUERMAN:  It does.  It says it
 4     under Account Resolution Services in number
 5     three.  And that's referring to the business
 6     formation document, which says alternate name
 7     Account Resolution Services.  And then at the
 8     bottom of your self-serving document it says
 9     abbreviation ARS and it says alternative
10     name.  It says abbreviation of alternative
11     name.
12          But your question was confusing because
13     I don't think he knew which alternate name
14     you're talking about.  I didn't know what you
15     are talking about.
16          MR. STERN:  You're saying there's more
17     than one alternate name on D-1?
18          MR. SCHEUERMAN:  No.  You are using
19     alternate name interchangeably.  And it's
20     referring to ARS and ARS Account Resolution
21     Services.
22          MR. STERN:  No, it doesn't.
23          MR. SCHEUERMAN:  It's a form objection.
24     And he can answer.  I'm not telling him not
25     to answer.  But based on how you were saying
```

**Exhibit 1**          **page 68 of 183**

- David Friedlander -

Page 69

```
1        the question it was confusing.
2              MR. STERN:  All D-1 does is take the
3        information that you have given me and put it
4        into -- on one piece of paper.  Let me
5        finish -- on one piece of paper.  The
6        business name is what the business name is
7        provided for in ARS03, which you provided to
8        me.  The alternate name is ARS Account
9        Resolution Services, which is the alternate
10       name that appears on ARS03 which you provided
11       to me.
12             MR. SCHEUERMAN:  You said he didn't
13       know what alternative -- alternate name
14       meant.
15             MR. STERN:  No, not alternative,
16       alternate name.  He did not know -- that's
17       true.  But he doesn't know what the
18       significance of alternate name is, but he
19       acknowledges that that's what the document
20       that you provided to me says.
21             And then what is there as ARS is
22       abbreviation of alternate name, because in
23       his sworn answer to interrogatories, which
24       you provided to me, it says, quote, ARS,
25       unquote, has always been used by the
```

- David Friedlander -

Page 70

```
 1     defendant as an abbreviation of ARS Account
 2     Resolution Services.  ARS Account Resolution
 3     Services is the alternate name as shown on
 4     ARS03.  So all that says is abbreviation of
 5     alternate name ARS.  So there's no two
 6     alternate names on here.  There is an
 7     alternate name and the abbreviation of
 8     alternate name.  He already said ARS is a
 9     shortened form of or short name or a
10     shortening of ARS Account Resolution
11     Services.
12          MR. SCHEUERMAN:  The question was
13     confusing because it was unclear what you
14     were referring to when you said the alternate
15     name.  Moreover --
16          MR. STERN:  If the question is
17     confusing it's not for you to identify it as
18     confusing.
19          MR. SCHEUERMAN:  It's an objection.
20     And I said ambiguous.  I have to make that
21     objection or it's waived.
22          MR. STERN:  You can make an objection
23     as to form.
24          MR. SCHEUERMAN:  I didn't tell him not
25     to answer.  I made a form objection.
```

**Exhibit 1**          **page 70 of 183**

- David Friedlander -

1          MR. STERN:  I didn't say that.  When

2     you say it's ambiguous or confusing to you,

3     it signals to the witness that the witness

4     should be careful that -- the witness may not

5     think it's ambiguous.  The witness may think

6     it's crystal clear.  But now the witness's

7     counsel told him, Look out, that question is

8     ambiguous.

9          MR. SCHEUERMAN:  Under the rules I have

10    to say the basis for the form objection to

11    give you an opportunity to amend it.

12         MR. STERN:  Not unless I ask you for

13    it.  You also cannot, as I read in the

14    guidelines from Hall versus Clifton, you

15    cannot give objections which signal to the

16    witness anything about responding to the

17    question.

18         MR. SCHEUERMAN:  It didn't.  All I said

19    was the basis for the form of the objection.

20         MR. STERN:  I disagree.

21         MR. SCHEUERMAN:  Can we bring him back

22    in?

23         MR. STERN:  What's your --

24         MR. SCHEUERMAN:  You can ask him

25    anything you want.

**Exhibit 1**          **page 71 of 183**

- David Friedlander -

Page 72

```
 1          MR. STERN:  I don't understand what
 2     your problem is.
 3          MR. SCHEUERMAN:  Your question that you
 4     asked him, it was unclear what you meant by
 5     alternate name.  So maybe you can walk him
 6     through that.
 7          MR. STERN:  If he doesn't understand
 8     the question, and I have no problem giving
 9     the instruction again.  The witness seems to
10     have no problem if I'm not accurately stating
11     something of telling me that or saying it's
12     not clear or he doesn't understand.  If he
13     doesn't understand it's not for you to raise
14     an objection to signal to him to say he
15     doesn't understand.
16          MR. SCHEUERMAN:  I have to raise an
17     objection if it's a bad question.
18          MR. STERN:  You can object to form.  If
19     I want to rephrase it I may ask you to
20     explain why -- what the problem with the form
21     is.  But you have preserved your objection by
22     saying objection to the form.
23          MR. SCHEUERMAN:  I will make the
24     objections as I see fit and interpret the
25     rules.
```

- David Friedlander -

Page 73

```
 1              MR. STERN:  You can make any objections
 2         you want.  But if they are outside the bounds
 3         of the guidelines then it's not proper.
 4              Let's take a five-minute break.
 5              (Whereupon there was a recess in the
 6         proceedings from 12:07 to 12:09 p.m.)
 7   BY MR. STERN:
 8         Q.   Is there someone at HRRG who is in
 9   charge of the management of this lawsuit?
10         A.   Yes.  Me.
11         Q.   Is there anyone that you have to report
12   to with respect to the management of this case?
13         A.   No.
14         Q.   What I understood in your response to
15   my question about whether ARS is named in the
16   contract between HRRG and Genesis, I was left with
17   the impression that ARS is not all of HRRG.  Is
18   ARS -- is referring to ARS refer to HRRG as the
19   entire company?
20         A.   No.
21         Q.   What does ARS do that the rest of HRRG
22   does not do?
23         A.   ARS performs collection services
24   related to more severely delinquent accounts,
25   older accounts than the accounts HRRG collects
```

- David Friedlander -

1   for.

2        Q.    Are the employees of HRRG -- excuse me,

3   withdrawn.

4             Are the employees of ARS separate and

5   distinct from employees of HRRG?

6        A.    Yes.

7        Q.    Does ARS occupy space that is separate

8   and apart from space occupied by HRRG?  And by

9   "space," I mean like office space where it

10  conducts its business.

11       A.    Yes.  It's contiguous space.  It's in

12  the same building and area within the building,

13  but it is not -- it's a separate space.

14       Q.    And it has its own structure of

15  hierarchy of management?

16       A.    Yes.

17       Q.    You are president of HRRG; correct?

18       A.    Yes.

19       Q.    And so that includes HRRG of which part

20  of that is ARS?

21       A.    Yes.

22       Q.    I would assume that there are multiple

23  ways to measure the size of a debt collection

24  business; by that, just for instance, number of

25  accounts, total of balances that are due on

**Exhibit 1**          **page 74 of 183**

- David Friedlander -

1   accounts, total amount that's actually collected

2   at any given period.  Would you agree those are

3   different ways that one could measure the size of

4   a debt collection business?

5        A.   Yes.

6        Q.   Okay.  Is there a way to measure the

7   size of the business that ARS does compared to the

8   remainder of what HRRG does?

9        A.   Yes.

10       Q.   How would you do that?

11       A.   There's a separation of accounts that

12  are placed in collections with HRRG as opposed to

13  the accounts placed with ARS.  So the results of

14  the two business units could be measured

15  separately based on the placement of those

16  accounts.

17       Q.   Are they, in fact, measured separately?

18       A.   Yes.

19       Q.   Do you know -- can you relate either by

20  way of percentages or fractions of how much

21  overall HRRG's business is ARS's business?

22       A.   Yes, I could estimate.  It would be a

23  very rough estimate.

24       Q.   If you -- with that understanding, what

25  would that estimate be?

**Exhibit 1**              **page 75 of 183**

- David Friedlander -

Page 76

1        A.    I would estimate ARS to be about a

2    third the size of HRRG.

3        Q.    And if you wanted to know more

4    specifically or a more accurate number, what would

5    you look at?  Are there documents, records, or

6    reports that you could look at to get a more

7    accurate number?

8        A.    Yes.

9        Q.    What are those documents that you would

10   look at?

11       A.    They would -- there are multiple

12   documents that would house that information, but

13   the financials.

14       Q.    How often are the financials prepared?

15       A.    They are updated monthly.  There are

16   separate reports that are run each month end.

17       Q.    So you could take -- for any given

18   month you could take the reports for that month

19   and have a fairly accurate number of what

20   percentage of HRRG's business is ARS?

21       A.    Yes.

22       Q.    And when you are roughly estimating a

23   third, month to month would -- you know, to what

24   extent do you think that would vary off of that

25   rough estimate, or would it stay pretty much in

**Exhibit 1**          **page 76 of 183**

- David Friedlander -

Page 77

1    that range?

2         A.    It would stay pretty much in that

3    range.

4         Q.    So it doesn't fluctuate that much?  It

5    doesn't fluctuate greatly?

6         A.    No.

7         Q.    Obviously "greatly" is a loose term,

8    but okay.

9              Are all of the accounts that ARS

10   attempts to collect accounts that are transferred

11   from the other side of HRRG's business?

12        A.    I'm not sure.  Could you explain what

13   you mean by "the other side of HRRG's business"?

14        Q.    Sure.  From what I understood from your

15   testimony is that ARS addresses the more severely

16   delinquent accounts; is that a fair statement?

17        A.    Yes.

18        Q.    Do accounts get placed directly with

19   ARS or do they get placed with HRRG, and then once

20   the account is evaluated for the severity of their

21   delinquency then the more severe ones are placed

22   with ARS?

23        A.    The accounts are first placed with

24   HRRG.

25        Q.    Because they are not delinquent yet?

**Exhibit 1**        **page 77 of 183**

- David Friedlander -

Page 78

1     A.   Then at some point after placement with

2  HRRG the accounts are evaluated and returned to

3  the HCFS billing system.

4     Q.   Okay.

5     A.   And a portion of those accounts are

6  then transferred in electronic file to be worked

7  by ARS.

8     Q.   Okay.  And when you say they are

9  evaluated, is that done by way of formulas or

10  algorithms, or is it done by an individual, you

11  know, looking at case-by-case basis or both?

12     A.   It's done based on parameters that have

13  been set up.

14     Q.   Okay.

15     A.   Those parameters may change from time

16  to time.

17     Q.   Understood.  And that's a judgment

18  called made by?

19     A.   By a person.

20     Q.   By a person.  Then it's programed into

21  your system to make those determinations?

22     A.   Yes.

23     Q.   And that's all done in-house?  That's

24  not done by outside third-party vendors; correct?

25     A.   Correct.

- David Friedlander -

Page 79

1      Q.    With respect to -- I wanted to finish

2  up with Genesis and the speech analytics that you

3  referred to it.

4      A.    Yes.

5      Q.    Is that done -- is that just purely a

6  quality control and training kind of function that

7  that serves?

8      A.    Yes.

9      Q.    Because I'm imaging what's happening,

10  it's analyzing, you know, its speech.  It's

11  recognizing the speech in those phone calls.  And

12  then based upon, again, whatever parameters you

13  set up in terms of what was discussed, maybe words

14  that are used, a whole bunch of analytics, voice

15  volume and how rapidly someone is speaking and

16  that kind of information goes into and is figured

17  out this is something that needs to be reviewed or

18  maybe corrected or we can improve in this way or

19  we need to talk to this agent, you know, and

20  compliment them because of the job they did, that

21  kind of stuff; that's what it's used for?

22      A.    Yes.

23      Q.    You are aware that this case involves

24  voicemail messages that were left for the Levins

25  by HRRG?

- David Friedlander -

Page 80

1        A.    Yes.

2        Q.    The voicemail messages left were either

3    prerecorded or computer-generated; correct?

4        A.    I believe so.

5        Q.    And just to be clear, to contrast that

6    from an actual agent being on the phone, and the

7    phone rings, voicemail comes on, and an agent left

8    a message; correct?

9        A.    Can you start the question again?

10        Q.    I was saying -- I was contrasting, you

11    know, a prerecorded message from a live agent is

12    actually leaving, you know, is on the line and

13    leaves the message, speaks the message live so

14    it's being recorded on the voicemail system is a

15    human being speaking to create that recording?

16        A.    Yes.  I was thinking about when you

17    said -- I think you said computer-generated.  And

18    we don't use any computer-generated messages.

19        Q.    Okay.  But it's a prerecorded?

20        A.    It would be a prerecorded message as

21    opposed to a live human leaving a message.

22        Q.    You have a vendor who provides the

23    messages itself, in other words, does the

24    recording?

25        A.    We use a vendor to record the messages

**Exhibit 1**              **page 80 of 183**

- David Friedlander -

1    we leave, yes.

2        Q.    And do you use a vendor to draft the

3    script of what's being said?

4        A.    No.

5        Q.    So that's -- the script is prepared

6    in-house?

7        A.    Yes.

8        Q.    And the script that was used in the

9    messages left for the Levins, has that script been

10   changed since the filing of this lawsuit?

11       A.    I don't believe it has.

12       Q.    Who approved the use of the script that

13   was used for the Levins' messages?

14       A.    I would say more than one person

15   reviewed it.  Ultimately I approved it.

16       Q.    When did HRRG first start using the

17   message that was left for the Levins?

18       A.    I don't recall the date that the

19   message was being -- was first used.

20       Q.    Were the calls placed by an outside

21   vendor?

22       A.    Not that I'm aware of.

23       Q.    Does HRRG or -- I don't know if it's

24   separate from ARS or not.  Does HRRG have its own

25   dialers?

**Exhibit 1**          **page 81 of 183**

- David Friedlander -

Page 82

1      A.    Yes.

2      Q.    So is it correct that the calls placed

3    to the Levins did not arise each time a call was

4    placed by a human being saying let's place a call

5    to the Levins now, but instead the Levins -- the

6    phone number was part of a batch of accounts on

7    which calls were going to be placed and were

8    queued into the dialer system?

9           MR. SCHEUERMAN:  Objection.  How is

10          this relevant to the two issues of the real

11          name issue?

12          MR. STERN:  It has to do with the use

13          of the ARS name.

14          MR. SCHEUERMAN:  What's the proffer?

15     A.    Well --

16          MR. SCHEUERMAN:  Stop.  I'm going to

17          object.  I object.  Don't answer the

18          question.  If you can go outside, I want to

19          see what the proffer is for this line.

20          MR. STERN:  You can stay right here.

21          The proffer is the voice messages say ARS.

22          MR. SCHEUERMAN:  Okay.

23          MR. STERN:  So the voice messages

24          reflect evidence of the use of ARS.  All

25          right?  Which is the issue -- the issue as

- David Friedlander -

Page 83

```
 1        defined by the court is the use of, quote
 2        unquote, ARS.
 3             MR. SCHEUERMAN:  So what's -- what are
 4        you trying to get at, that they say ARS in
 5        the message?  What's the proffer?
 6             MR. STERN:  I'm trying to find out how
 7        they use ARS.
 8             MR. SCHEUERMAN:  What they say in the
 9        message?
10             MR. STERN:  No.
11             MR. SCHEUERMAN:  What's the issue?
12             MR. STERN:  I know they say in the
13        message, they use ARS.  I'm trying to find
14        out how they use it.
15             MR. SCHEUERMAN:  What you don't mean
16        "how they use it"?
17             MR. STERN:  Exactly what I'm getting
18        at.  Exactly what we are talking about.  Is
19        it a dialer or --
20             MR. SCHEUERMAN:  How is using a
21        dialer --
22             MR. STERN:  -- or individual.
23             MR. SCHEUERMAN:  How does using a
24        dialer, how is that relevant to this?
25             MR. STERN:  It goes to the general
```

**Exhibit 1**          **page 83 of 183**

- David Friedlander -

Page 84

1     usage of the name.

2         MR. SCHEUERMAN:  If they are using a

3     dialer or not, if the message is the same it

4     doesn't matter.  So using a dialer or someone

5     physically picking up and calling --

6         MR. STERN:  So if you want to stipulate

7     that we can exclude that any fact as to

8     whether HRRG uses the name ARS in messages to

9     any other consumer, then we can take that out

10    of the case.

11        MR. SCHEUERMAN:  I'm not stipulating

12    anything.

13        MR. STERN:  I'm trying to find out

14    about the facts about that.

15        MR. SCHEUERMAN:  There's no class --

16    what are you trying to figure out, whether

17    they use the same message with other

18    consumers?  You're talking about use of a

19    dialer.

20        MR. STERN:  I don't know what I'm

21    talking about because he hasn't answered the

22    question.

23        MR. SCHEUERMAN:  I object.  You can

24    mark that down.

25        MR. STERN:  You are not going to let me

**Exhibit 1**          **page 84 of 183**

- David Friedlander -

```
 1        ask him how they use this voice message?  You
 2        are not going to let me ask him how they do
 3        that?
 4              MR. SCHEUERMAN:  That's not your
 5        question.
 6              MR. STERN:  The question is related to
 7        the usage.
 8              MR. SCHEUERMAN:  What's the question
 9        you want to use?
10              MR. STERN:  You can't ask -- make me
11        ask the question you want me to ask.
12              MR. SCHEUERMAN:  I'm not.
13              MR. STERN:  I can ask the question to
14        get to the facts the same way.
15              MR. SCHEUERMAN:  I object.  It's beyond
16        the scope based on what I heard.
17              MR. STERN:  Let's mark it.
18              I can't ask him anything about the
19        dialer and how they use the dialer; right?
20              MR. SCHEUERMAN:  No.  What's the
21        proffer?
22              MR. STERN:  I want to be clear.
23              MR. SCHEUERMAN:  What's the proffer?
24              MR. STERN:  I made the proffer already.
25        I'll ask the question.
```

**Exhibit 1**          **page 85 of 183**

- David Friedlander -

Page 86

1   BY MR. STERN:

2        Q.    Does the dialer use an IVR system?

3        A.    No.

4        Q.    Does the dialer or any other mechanism

5   allow for detecting whether or not a phone call is

6   answered by a live person or by a machine?

7        A.    Yes.

8        Q.    Is there more than one prerecorded

9   message that HRRG uses when leaving a voicemail

10  message?

11       A.    Yes.

12       Q.    How many currently are used?

13       A.    I don't know.

14       Q.    How many of them identify the caller as

15  ARS?

16       A.    I don't know.

17       Q.    Do all of them identify the caller as

18  ARS?

19       A.    No.

20       Q.    Was the Levins' debt placed with HRRG

21  but not with ARS at any point in time?

22       A.    Yes.

23       Q.    Was it placed with HRRG but not with

24  ARS prior to or after it was placed with ARS?

25       A.    Prior to.

**Exhibit 1**                    **page 86 of 183**

- David Friedlander -

1      Q.    The copy of the letter that was sent to

2  the Levins that appears as ARS4 in D-2, you said

3  that the return address was an address for ARS;

4  correct?

5      A.    Yes.

6      Q.    Does the non-ARS part of HRRG send

7  collection letters?

8      A.    Can you just go back to the -- does the

9  non what?

10     Q.    The non-ARS part of HRRG --

11     A.    Okay.

12     Q.    -- use collection letters?

13     A.    Yes.

14     Q.    And they use the same vendor?

15     A.    Yes.

16     Q.    And do they use the same return

17  address, the same PO Box that's reflected in ARS4?

18     A.    No.

19     Q.    Do letters sent by the mail vendor ever

20  get returned undelivered?

21     A.    Yes.

22     Q.    What happens with those undelivered

23  letters?

24     A.    They go -- some go back to the letter

25  vendor, some are returned to our office in

**Exhibit 1**          **page 87 of 183**

- David Friedlander -

1    Sunrise.

2        Q.    Why would some be returned to the

3    vendor and some come back to the office?

4        A.    It depends what -- it depends on a

5    number of factors.  But it could be sent back as

6    the result of being non-deliverable or it could be

7    sent back as the result of someone not being at

8    the address that we are sending the letter out to.

9        Q.    So it depends on what's -- what the

10   post office put on the envelope; is that fair?  Is

11   that one of the factors?

12       A.    Yes.  The post office determines what

13   happens with the return mail.

14       Q.    Sometimes the post office will put a

15   label on with a forwarding address but saying the

16   forwarding address had expired, is that one of

17   the -- correct?

18       A.    Not normally, no.

19       Q.    Okay.  Are all return envelopes checked

20   for -- to re-verify the address?

21       A.    No.

22       Q.    Is there any information placed in the

23   account notes when an envelope is returned?

24       A.    Yes.

25       Q.    Are all return envelopes -- is the fact

**Exhibit 1**                    **page 88 of 183**

- David Friedlander -

1    that an envelope is returned always noted in the

2    account notes?

3         A.    I wouldn't say always, but we try to

4    make sure that all return mail is processed and

5    noted in the system.

6         Q.    And what happens to returned mail is

7    all determined in-house; in other words, within

8    HRRG as an initial matter; correct?

9         A.    Yes.

10        Q.    I understand some of it goes back to

11   the mail vendor so the mail vendor may have

12   followup subsequent.  But initially it's all

13   in-house, as you said?

14        A.    I said it was determined at HRRG.

15        Q.    Yes.  Initially?

16        A.    Yes.

17             MR. STERN:  Off the record.

18             (Discussion off the record.)

19             (Whereupon there was a recess in the

20        proceedings from 12:39 to 1:42 p.m.)

21   BY MR. STERN:

22        Q.    Do you have D-3 in front of you?  It's

23   the answers to interrogatories.

24        A.    Yes.

25        Q.    Let's go back to D-2.  Drawing your

**Exhibit 1**                    **page 89 of 183**

- David Friedlander -

Page 90

1   attention to ARS7 through 12.  You had referred
2   earlier in your testimony to account notes.  Is
3   ARS7 through 12 the account notes for the debt ARS
4   tried to collect from the Levins?
5       A.    This is a printout for the account
6   notes, yes, for the Levins.  80864955 is the
7   account.
8       Q.    Does it show on -- you said it's a
9   printout of the account notes.  Referring to them
10  as the account notes is not accurate.  It's a
11  printout of the account notes.  The account notes
12  are maintained electronically?
13      A.    Yes, that's true.
14      Q.    You made that distinction.  If I
15  referred to these pages as the account notes, that
16  would not be accurate; correct?
17      A.    I said this is a printout of the
18  account notes.  It's an accurate representation of
19  the account notes at the time it was printed up.
20      Q.    On page ARS7, you see that not quite --
21  about halfway down the page on the left-hand side
22  in all capital letters it has the word NOTES?
23      A.    Yes.
24      Q.    And are the notes all the text which
25  follows and follows all the way through ARS12

- David Friedlander -

1    until it says end of report?

2         A.    Yes.

3         Q.    And is there a description you have

4    for, I don't know, the text that precedes these

5    notes on ARS7?  Do you see where -- is there a

6    name for that section?  I don't know if it's one

7    or more sections on ARS7, in other words, which is

8    above the notes.

9         A.    Yes, I see that section.

10        Q.    Okay.

11        A.    Is there a name for that?  No, we don't

12   use a specific name for that section.

13        Q.    Okay.  When it says -- I want to go

14   through this in some detail.  I have some

15   questions about these -- the printout of the

16   account notes.

17        A.    Okay.

18        Q.    I'll try to do it in the order it

19   appears.  It says -- there's a line that says,

20   "collector HSA0 house route," what does that mean?

21        A.    It is a term that is referencing the

22   collector route; that it is not assigned to an

23   individual agent, it is a house route, which would

24   be meaning the agency.

25        Q.    Okay.  Let me ask you, in the upper

Veritext Legal Solutions

**Exhibit 1**          **page 91 of 183**

- David Friedlander -

Page 92

```
 1    left it's got a date there of 2-17-17; do you see
 2    that?
 3         A.    Yes.
 4         Q.    And a time of 10:33 a.m.?
 5         A.    Yes.
 6         Q.    Is that the date and time this printout
 7    was made?
 8         A.    Yes.
 9         Q.    And it's PJB, is that the initials of
10    the individual who generated the report?
11         A.    Yes.
12         Q.    Generated the printout?
13         A.    Yes.
14         Q.    Do you know who PJB is?
15         A.    Yes, I do.
16         Q.    Who is that?
17         A.    A Patrick Brennan.  Pat Brennan.  Pat
18    is short for Patrick.
19         Q.    Is Patrick Brennan an employed by HRRG?
20         A.    Yes.  He's employed by -- I'm going to
21    take back the yes on that.
22         Q.    Okay.
23         A.    And say I believe he's an HRRG
24    employee.
25         Q.    When you referred to agents, there are
```

**Exhibit 1**          **page 92 of 183**

- David Friedlander -

1    agents who work within ARS and there are agents

2    who work within HRRG but not within ARS; correct?

3        A.    Yes.

4        Q.    Are those -- is an agent who works for

5    HRRG but not ARS and an agent who works for ARS

6    paid by the same entity?

7                MR. SCHEUERMAN:  Objection to form.

8        How is this related to the issues, the true

9        name issue?

10               MR. STERN:  Can you please step out?

11               MR. SCHEUERMAN:  You can step out.

12               (Witness leaves the room.)

13               MR. STERN:  One aspect of any

14       businesses transaction is the payment of its

15       employees.  If all the employees are paid by

16       HRRG with no designation of ARS, that's

17       relevant to whether ARS is a name under which

18       HRRG usually transacts business.  If it

19       doesn't pay its employees -- some employees

20       as ARS and others as HRRG, I think that is a

21       fact relevant to whether or not --

22               MR. SCHEUERMAN:  Okay, I agree.

23       Anything else for that line?

24               MR. STERN:  I don't know where it's

25       going to go.

**Exhibit 1**          **page 93 of 183**

- David Friedlander -

Page 94

```
1              MR. SCHEUERMAN:  In that aspect I
2        agree.  I may not agree with everything else
3        you are going to say related to this.
4              (Witness returns.)
5              MR. STERN:  Can you read that back,
6        please?
7              (Record read.)
8        A.    Yes.
9        Q.    Who is that entity?
10       A.    Ameriteam Services.
11       Q.    Can you spell that?
12       A.    A-M-E-R-I-T-E-A-M Services.
13       Q.    Is Ameriteam Services an affiliated
14   company with HRRG and HCFS?
15       A.    I don't know.
16       Q.    Is Ameriteam an employee leasing
17   company?
18       A.    I don't know.
19       Q.    Does Ameriteam manage the agents?
20       A.    No.
21       Q.    Does HRRG pay money to Ameriteam that's
22   used to pay the agents?
23       A.    I don't know.
24       Q.    Are agents paid either a salary or an
25   hourly wage or commission or a combination?
```

**Exhibit 1**          **page 94 of 183**

- David Friedlander -

```
 1        A.    A combination.

 2        Q.    Is Ameriteam like a payroll service?

 3        A.    I don't know what they are.  I just see

 4   the name on the checks.

 5        Q.    By whom are you paid?

 6        A.    My checks have Ameriteam Services on

 7   them.

 8        Q.    Do you receive a W-2 form every year?

 9        A.    Yes.

10        Q.    Do you know whose name is the employer

11   on your W-2?

12        A.    Yes.  I think it's Healthcare Revenue

13   Recovery Group --

14        Q.    Do you know --

15        A.    -- LLC.

16        Q.    I'm sorry.  Do you know whose name

17   appears as the employer on the W-2s that are

18   issued to the agents?

19        A.    I believe it's also Healthcare Revenue

20   Recovery Group, LLC.

21        Q.    Is there any information different in

22   terms of identifying the employer depending on

23   whether an agent is working within ARS or not

24   working within ARS but working for HRRG?

25        A.    I'm not sure.  I think there is.  I'm
```

**Exhibit 1**              **page 95 of 183**

- David Friedlander -

Page 96

1   not sure what name is on their checks as far as

2   the, you know, the subgroup.

3        Q.   When ARS receives payments from

4   consumers on the debts, where do those payments

5   go?

6        A.   The payments are directed to a lockbox

7   in Cincinnati, Ohio.

8        Q.   You mean for mailing checks?  Is that

9   what you mean when you say payments are directed

10  to a lockbox?

11       A.   Yes.

12       Q.   Where do they get deposited?

13       A.   They get deposited into Fifth Third

14  Bank.

15       Q.   Whose account?

16       A.   Whatever the lockbox number is that's

17  on the remittance that comes with the check.

18       Q.   And what does that lockbox number

19  represent?

20       A.   The lockbox number would represent the

21  business unit that is collecting the money.

22       Q.   So is that the billing company or the

23  healthcare provider?

24       A.   There are lockboxes for the billing

25  company and there are lockboxes associated with

**Exhibit 1**          **page 96 of 183**

- David Friedlander -

Page 97

1   Healthcare Revenue Recovery Group and separate

2   lockboxes for ARS.

3          Q.    Okay.  If a payment is made by a credit

4   card on an account that's been collected by ARS, I

5   understand there's language in -- either on your

6   website or in your letter materials which state

7   that ARS will appear on the consumer credit card's

8   statement; are you aware of that?

9          A.    Yes, I am.

10         Q.    When ARS takes a credit card payment,

11  is that payment processed through a merchant

12  servicer?

13         A.    Yes.

14         Q.    Is the same merchant servicer that

15  process payments made on an account being

16  collected by HRRG but not ARS?

17         A.    Yes.

18         Q.    Is it the same merchant servicer for

19  both?

20         A.    Yes.

21         Q.    Is there a contract for the merchant

22  servicer's services?

23         A.    Yes.

24         Q.    Who are the parties to the contract?

25         A.    The processor Billing Tree.  And the

**Exhibit 1**          **page 97 of 183**

- David Friedlander -

Page 98

1   contracts are between Billing Tree and HRRG, and
2   separate contracts between Billing Tree and ARS.
3        Q.    Who signs the contract on behalf of
4   HRRG?
5        A.    I sign it.
6        Q.    And who signs the contract on behalf of
7   ARS?
8        A.    I sign it.
9        Q.    When you sign on behalf of ARS, is
10  there any designation of ARS and HRRG?
11       A.    In my signing it?
12       Q.    Yes.
13       A.    I don't make a distinction when I sign.
14       Q.    So when you sign the contract with ARS
15  you are signing as president of HRRG?
16       A.    I would just sign as president.  The
17  ARS would be above where I would sign it.
18       Q.    But ARS is not a separate entity;
19  correct?
20       A.    Correct.
21       Q.    It's a group or, I don't know how you
22  would term it, a division, a group, a section, a
23  team; how do you refer to it?
24       A.    I refer to it as a division, but it's a
25  separate business unit.

**Exhibit 1**            **page 98 of 183**

- David Friedlander -

Page 99

```
 1        Q.    It's a separate business unit but it
 2   doesn't have a separate corporate entity; correct?
 3        A.    To tell you the truth, I'm not sure if
 4   they have a separate tax ID for ARS and HRRG.
 5   They may, I'm not sure.
 6        Q.    Okay.  And whether they have a separate
 7   ID number, you understand a single -- withdrawn.
 8             I'm sure counsel is going to object
 9   when we start talking about the legal
10   distinctions.  But do you understand that a
11   limited liability company and a corporation are
12   treated as if it were a person with respect to
13   having certain legal rights; do you understand
14   that concept?
15             MR. SCHEUERMAN:  Objection to form.
16        A.    Yes.
17        Q.    As I understand your testimony, as well
18   as the information that's been provided by counsel
19   in this case, is that ARS Account Resolution
20   Services is an alternate name for HRRG and we have
21   looked at that certificate.  And we have also
22   talked about that the letters A-R-S is just a
23   short version of ARS Account Resolution Services.
24   So my understanding is that ARS Account Resolution
25   Services is not a separate legal entity; in other
```

**Exhibit 1**                    **page 99 of 183**

- David Friedlander -

Page 100

1   words, it's treated as a person, the same way as a

2   corporation or LLC is treated as a person?

3          MR. SCHEUERMAN:  Objection to form.  I

4       object to form.

5   BY MR. STERN:

6       Q.   The distinction I'm making in what I

7   just described --

8          MR. SCHEUERMAN:  I object to form.  I'm

9       going to put the basis on.  If you want him

10      to step out I'm going to put the basis for

11      the objection.

12         MR. STERN:  You don't have to.  I don't

13      need him to --

14         MR. SCHEUERMAN:  Yes or no?

15         MR. STERN:  I'm not withdrawing the

16      question.  You observed your objection.

17         MR. SCHEUERMAN:  I need to put the

18      basis on.  Do you want him to step out or

19      put --

20         MR. STERN:  Please step out.

21         (Witness leaves the room).

22         MR. SCHEUERMAN:  It calls for a legal

23      conclusion.  You can come back in, David.

24         MR. STERN:  Not yet.  Hold on a second.

25      The problem I have is that the position that

**Exhibit 1**          page 100 of 183

- David Friedlander -

Page 101

1    has been presented is one of legal

2    significance as to whether it's shortened as

3    ARS or longer as ARS Account Resolution

4    Services is a division, or as he described

5    it, a business separate unit.  But it's not a

6    separate legal entity.  If you have a witness

7    that doesn't understand the distinction it's

8    very difficult for me to get the information

9    that I need.

10         MR. SCHEUERMAN:  Well --

11         MR. STERN:  Because that's the position

12   you have taken.  He doesn't understand what

13   alternate names are.  He doesn't understand

14   the distinction between that HRRG is a formed

15   limited liability company in the State of

16   Florida and, therefore, it's treated as a

17   legal person versus a business unit.  He

18   doesn't understand the distinction, and

19   that's a problem I think.

20         And I think the scope of the topics,

21   and I can go through them, clearly requires

22   that somebody is here who understands that

23   distinction.

24         MR. SCHEUERMAN:  Ask the witness that.

25         MR. STERN:  I have asked him, he

**Exhibit 1**          **page 101 of 183**

- David Friedlander -

Page 102

```
 1      doesn't understand that.
 2            MR. SCHEUERMAN:  I didn't tell him not
 3      to answer.
 4            MR. STERN:  He doesn't understand.
 5            MR. SCHEUERMAN:  You are telling me.
 6      The record reflects what the record reflects.
 7            MR. STERN:  I know it was a lengthy
 8      explanation before the question which he
 9      objected to.  But if you can read that back.
10            (Previous record read.)
11 BY MR. STERN:
12      Q.    Mr. Friedlander, I had given an
13 explanation and then asked you a follow-up
14 question based upon what I was explaining.  Your
15 counsel raised an objection that was placed on the
16 record.  I'm going to have the court reporter read
17 back the explanation again and I'll follow up with
18 the question.
19            (Previous record read.)
20 BY MR. STERN:
21      Q.    Do you understand the distinction
22 between use of an alternate name and a legal
23 entity that I'm talking about in that explanation?
24      A.    No, I don't really understand.
25      Q.    Okay.  In your mind, is either ARS or
```

- David Friedlander -

Page 103

1    ARS Account Resolution Services a separate entity

2    from HRRG?

3              MR. SCHEUERMAN:  Same objection.  You

4         can answer.

5         A.    I don't think it is.

6         Q.    Do you agree that ARS and ARS Account

7    Resolution Services are names that HRRG applies to

8    the separate business unit that you described that

9    handles the more delinquent debts?

10        A.    Yes.

11        Q.    We can get back now to the printout of

12   the account notes on D-2, page 7.

13             Moving down, there's a line that begins

14   status.  I think you identified that's the account

15   number that was applied to this account.  And then

16   it's followed by the word disposition, colon, and

17   it says -- can you explain what that -- those next

18   words mean?

19        A.    Yeah.  It's just a descriptor for the

20   disposition, which is the computer classification.

21   Like a 3ATY means represented by an attorney.

22        Q.    Okay.  So the 3ATY is sort of a code?

23        A.    Yes.

24        Q.    And the code means represented by

25   attorney.  So both appear there?

**Exhibit 1**          **page 103 of 183**

- David Friedlander -

Page 104

1      A.    Yes.

2      Q.    And what does "wait" mean, and it's

3  followed by a date?

4      A.    That would hold activity until a

5  certain date, is what I believe that means.

6      Q.    Okay.  The next line starts, it says

7  debtor and it says name Levins, **REDACTED** followed

8  by what I presume is what ARS understood to be her

9  social security number, followed by a phone number

10  for her.

11      A.    Yes.  That's the -- yes.

12      Q.    So on the next line it says RP, what

13  does that mean?

14      A.    Responsible party.  **REDACTED** is the

15  patient, Elaine is the responsible party.

16      Q.    Okay.  Is there any way that you can

17  tell from, I guess you can from further down where

18  it says born.

19      A.    Date of birth of the patient.

20      Q.    You would know the patient is a minor.

21  You would be able to tell that from the date of

22  birth?

23      A.    From the date of the birth, yes.

24      Q.    And then a few lines down, I assume

25  that it's a shortened form for client, CLNT?

**Exhibit 1**        **page 104 of 183**

- David Friedlander -

Page 105

```
 1        A.    Yes.
 2        Q.    Followed by a six-digit number, and
 3   then a reference -- that's the identification of
 4   the provider, the healthcare provider?
 5        A.    That's the -- our client code, yes.
 6        Q.    Is that a unique client code, a name
 7   for -- that ARS uses, or is that -- does that sort
 8   of get carried forward from the billing company?
 9        A.    It is one of the data elements that
10   comes from the billing company.
11        Q.    And on the next line it starts with the
12   word list.  What does that -- there's a date under
13   that, November 24, 2015.  What does that
14   represent?
15        A.    That's the date that the account was
16   placed with ARS.
17        Q.    And the next one, SRD, September 2,
18   2014.
19        A.    That's the service date.  The date the
20   physician services were provided.
21        Q.    And LTRS, is that the number of letters
22   that were sent?
23        A.    Yes.
24        Q.    By ARS?
25        A.    Yes.
```

**Exhibit 1**          **page 105 of 183**

- David Friedlander -

Page 106

1     Q.    And then there's the word time, and it
2   says 5; what does that mean?
3     A.    I don't know.
4     Q.    And call 67, is that the number of
5   calls placed to the responsible party?
6     A.    That is, I believe, the number of call
7   attempts.
8     Q.    The next word is con zero; what does
9   that mean?
10    A.    I don't know.
11    Q.    And the balance, I assume that's the
12  amount of the balance shown on the account?
13    A.    Yes.  The remaining balance on the
14  account.
15    Q.    The next -- I don't know if you call it
16  a subsection or not.  Moving down it says multiple
17  accounts.  Were there multiple accounts involved
18  here?
19    A.    No.
20    Q.    So the information that appears in the
21  few lines below that is just the same information
22  on the same debt, not a different debt; correct?
23    A.    Correct.
24    Q.    Let's move down to the section on
25  notes.  I observed that in the first column there

- David Friedlander -

Page 107

1   are a few variations on the first page, it says

2   GAP.

3        A.    Yes.

4        Q.    And that proceeds until ARS9.  And then

5   there's GC.  GC is on 10.  On ARS 11 there's GC

6   and PJB.  And on 12 there's GC and PJB.  Am I

7   correct that the PJB refers to Patrick Brennan?

8        A.    Yes.

9        Q.    What do the others refer to?  The GA --

10       A.    GAP refers to Gregory Preston.

11       Q.    And GC?

12       A.    GC is a system generated transaction.

13       Q.    Does ARS perform any scrubs on any

14   accounts as a matter of course?

15       A.    Yes.

16       Q.    What scrubs do they perform?

17       A.    They perform scrubs to find

18   bankruptcies.

19       Q.    Is that the banco?

20       A.    Yes.  That's -- that's one of the

21   scrubs that they do, yep.  I think they do a

22   deceased scrub and they do a scrub for accounts

23   who are frequent litigants.  That's the web recon,

24   W-E-B  R-E-C-O-N, scrub.

25       Q.    We talked about the account was first

**Exhibit 1**

- David Friedlander -

Page 108

1   listed on November 24, 2015.  And there's, I think

2   rough count quickly, about seven lines that have a

3   date of November 24, 2015 on page ARS07.  Do you

4   see that?  Do you see those lines?

5        A.    Yes.

6        Q.    In there is the web recon that you just

7   mentioned.

8        A.    Yes.

9        Q.    And is there any indication in any of

10  those notes as to the bankruptcy scrub or the

11  deceased scrub?

12            MR. SCHEUERMAN:  How is this relevant

13       to the true name issue?  Objection.  How is

14       that relevant?  Do you want him to step out?

15       I mean, we are going far afield here.

16            MR. STERN:  I am -- this is a document

17       that you produced in discovery.

18            MR. SCHEUERMAN:  Okay.

19            MR. STERN:  Not withstanding that if it

20       was not -- if it was outside the scope of

21       discovery maybe that would have been an

22       objection at the time you produced this.  I'm

23       trying to find out what this means.  I don't

24       know what it means, so I don't know if it's

25       related or not.  He just testified to scrubs

**Exhibit 1**        **page 108 of 183**

- David Friedlander -

```
 1        that were done.  And so I'm just trying to
 2        find out where that information comes from.
 3              MR. SCHEUERMAN:  I object.  I mean, the
 4        judge's order from yesterday says discovery
 5        is limited to the true name issue at this
 6        juncture.  I don't know how a bankruptcy
 7        scrub is relevant to that issue.
 8              MR. STERN:  I don't know until I can
 9        find out.  I'm trying to find out what the
10        information is you provided to me.
11              MR. SCHEUERMAN:  I object.
12              MR. STERN:  If you don't want him to
13        answer.
14    BY MR. STERN:
15        Q.   Don't tell me where the bankruptcy
16    scrubs are or the deceased scrubs are.
17              Do you see there on ARS07 there's a
18    line with a date of November 25, 2015.  There's a
19    whole bunch and they are all dated 844.  So there
20    are a series of ones on the 25th that within the
21    line there are dates that predate November 24,
22    2015.
23        A.   Yes, I see that.
24        Q.   Okay.  And there is one that I see that
25    refers to -- has the word "letter" in the
```

**Exhibit 1**                    **page 109 of 183**

- David Friedlander -

Page 110

1  description.  Do you see that one?

2       A.    Yes.

3       Q.    With an internal date of January 24,

4  2015, 12 p.m.  What letter is that?

5       A.    These are notes that were imported.

6  When ARS first loaded the account information

7  there are transactional notes that come over from

8  HRRG's system.  And this is all part of the notes

9  that are imported into the ARS record from HRRG's

10 actual transactional information.

11      Q.    Okay.  And is there --

12      A.    Some of the HRRG transactional

13 information is imported from the billing system.

14      Q.    Okay.

15      A.    So where it says -- on the line you're

16 talking about where it says credit letter sent to

17 994 --

18      Q.    Yes.

19      A.    -- that is a financial class change

20 that's taken place on the client billing system

21 before the account went to HRRG.  It is used for

22 historical purposes to know that certain processes

23 took place prior to the account making its way to

24 the collection agency and to that part of the

25 revenue cycle.

**Exhibit 1**          page 110 of 183

- David Friedlander -

Page 111

1      Q.    Okay.  Now, let me ask you this:  A
2  number of the entries, we have the column with the
3  initials of the person or the GC -- I'm running
4  across the line -- a date, a time, and then we
5  start to have some text.  There's quite a number
6  that start with the letters HRG.
7      A.    Yes.
8      Q.    Does that indicate that the information
9  is information that was brought over from HRG?
10      A.    Yes, it does.
11      Q.    Are there other entries that are also
12  brought over from HRG that don't begin with HRG at
13  the beginning of the line?
14      A.    There are lines that are carried over
15  from the preceding line --
16      Q.    Right.
17      A.    -- that don't have HRG at the beginning
18  of the line.  There are the -- I think seven lines
19  up above that don't have the HRG that are not from
20  the HRRG record.
21      Q.    Okay.
22      A.    But for the most part, all of that data
23  going down to -- through where the time is 8:44,
24  11-25 at 8:44, that would, for the most part, be
25  all imported transactional notes that loaded when

**Exhibit 1**          **page 111 of 183**

- David Friedlander -

Page 112

1    the account first was placed with ARS.

2         Q.    Are there account notes that HRRG has

3    that preceded the placement of the account with

4    ARS?

5         A.    Yes.

6         Q.    And are all of those account notes

7    incorporated within the ones you just described?

8         A.    Not necessarily all the notes that HRRG

9    has.  Only the notes that are part of the data

10   interfaced that is imported --

11        Q.    Okay.

12        A.    -- at the time ARS first loads the

13   account.

14        Q.    Okay.  So if you turn to the ARS8.

15        A.    Yep.

16        Q.    Actually, I have a bunch of questions

17   mostly on this page about all those entries that

18   were imported or about some of the entries.

19              The first five lines refer to a series

20   of dates that occurred in March 2015 and times.

21   Do you know what those notes mean?

22        A.    Yes.

23        Q.    What do they mean?

24        A.    These are transactional notes.  The

25   TRNA -- these notes were imported into HRRG's

**Exhibit 1**          **page 112 of 183**

- David Friedlander -

Page 113

```
1    system from their prior collection software
2    system, which was CR Software.  The TRNA is an
3    abbreviation for "telephone residence, no answer."
4    And CMP01 is the calling campaign that was dialed,
5    campaign 1.
6         Q.    What's a calling campaign?
7         A.    It's numbers that are within a calling
8    list.
9         Q.    When you say a "campaign," that
10   reflects -- so the very first one on ARS8, that
11   notes a record of a phone call having been placed
12   to Ms. Levins; correct?
13        A.    Yes.
14        Q.    Does it reflect -- on those calling
15   campaigns that's loaded into your -- I assume it's
16   computers but the telephone systems that you use
17   in-house, I think I referred to them as a dialer
18   before.  Correct, that's where it gets loaded?
19   You said there's a list that gets loaded into the
20   dialing system?
21        A.    No, I wouldn't -- I don't agree with
22   that.
23        Q.    When these calls are placed, are
24   these -- are agents individually picking up the
25   phone and dialing these numbers on one of these
```

**Exhibit 1**          **page 113 of 183**

- David Friedlander -

Page 114

1    campaigns or on this campaign?

2         A.    Agents are on the phone.  They are not

3    picking up the receiver of a phone.  They are

4    wearing headsets.  They are making and receiving

5    calls.

6         Q.    All right.  Is this call that's

7    designated on the first line a call that was

8    placed by -- let me step back so we are clear.

9              I assume what you are saying they are

10   on a headset.  They can place a call by something

11   on their screen shows them there's a phone number

12   and somehow they can click on something and the

13   call gets placed; is that correct, as opposed to a

14   manual telephone that they are pushing buttons?

15   Correct, is that how it's done when they place a

16   call?

17        A.    No, no.  That's not how it's done.

18        Q.    How does an agent place a call?

19              MR. SCHEUERMAN:  Objection.  Beyond the

20        scope of the discovery order.

21              MR. STERN:  It's not.  These are calls

22        placed by HRRG to my clients.

23              MR. SCHEUERMAN:  You're saying how --

24        how the manner in which they dial it --

25              MR. STERN:  I'm trying to describe --

**Exhibit 1**          **page 114 of 183**

- David Friedlander -

Page 115

1    he described the campaign.
2         MR. SCHEUERMAN:  How is that relevant
3    to whether they typically use ARS as a name?
4    How is that relevant?
5         MR. STERN:  We will find out -- once I
6    know how the call was placed, I can find out
7    what was -- how -- what was used.
8         MR. SCHEUERMAN:  What's your proffer?
9         MR. STERN:  Can you please leave the
10   room?
11        (Witness leaves the room.)
12        MR. STERN:  I'm going to say generally
13   again, first is any kind of activity of your
14   client and then that activity and whether
15   they are using HRRG or ARS or some other name
16   is relevant to the issues in this case.
17        MR. SCHEUERMAN:  An activity in
18   which --
19        MR. STERN:  Any activity that they
20   engage in.  What manner in which they use
21   that activity is relevant.  So HRRG, we
22   already know HRRG, whether it's the business
23   entity that's ARS or HRRG, it's all coming
24   from HRRG.  That's the only legal entity
25   here.

- David Friedlander -

Page 116

1             MR. SCHEUERMAN:  Why don't --

2             MR. STERN:  So if he called up -- if in

3      this campaign they called up and said HRRG

4      calling, that's evidence of them not using

5      ARS.  But I don't even know what it means,

6      this campaign.

7             MR. SCHEUERMAN:  I don't understand why

8      you can't simplify and ask him that.  If

9      during oral communications how did you

10     represent yourself, as ARS, as HRRG, or what,

11     or what oral communications do you -- I don't

12     understand.

13            MR. STERN:  Because I have a record

14     that you have provided to me of a specific

15     call on a specific date and time.  And I want

16     to know what that information is on that

17     specific call.

18            MR. SCHEUERMAN:  As to what --

19            MR. STERN:  Because we know there are

20     calls that they used ARS.  But I want to know

21     about this call.

22            MR. SCHEUERMAN:  As to whether someone

23     physically called or whether it was --

24            MR. STERN:  I don't know.

25            MR. SCHEUERMAN:  -- a message?

**Exhibit 1**          **page 116 of 183**

- David Friedlander -

Page 117

1           MR. STERN:  I don't know.  I don't know

2      yet.  He hasn't answered the question.  If

3      someone physically called, what script were

4      they provided?  How were they trained in

5      terms of what they were supposed to say?  I

6      don't know that.

7           MR. SCHEUERMAN:  But you are not asking

8      those questions.

9           MR. STERN:  I haven't gotten there yet.

10          MR. SCHEUERMAN:  You never seem to

11     be -- it doesn't seem like that's your end

12     game.

13          MR. STERN:  That is.

14          (Witness returns.)

15 BY MR. STERN:

16     Q.    Maybe try a different approach.  Maybe

17 a more general question.  Maybe I can get the

18 information I'm looking form.

19          You identified in that first line that

20 a call was placed to my client on March 3, 2015 at

21 6:49 p.m.  I'm trying to find out how was the call

22 placed and what information is there about what

23 happened during that call.

24     A.    Okay.  As we were saying, these are

25 notes that were imported from two systems before

**Exhibit 1**          **page 117 of 183**

- David Friedlander -

Page 118

1   the system that's --

2       Q.    You're currently using.

3       A.    -- we are on.  So those notes were from

4   when HRRG was collecting in the primary phase of

5   collections for this account from the Levins.

6       Q.    Right.

7       A.    The agent had a headset.  The number

8   would be selected to be dialed from the database

9   based on the parameters that are set up within

10  that system.  So a campaign would be an

11  integration that causes a phone number to be sent

12  from the database to be dialed by the dialer.

13  Before the agent can get that call they have to be

14  logged in, and they have to be available and

15  waiting for a call.  And they have to be the agent

16  who is logged into that specific calling campaign;

17  and they have to be the agent that's been waiting

18  for a call the longest with the specific skill set

19  needed to answer the call.

20      Q.    The system places the call and then

21  detects if there was a live answer; right?

22      A.    Yes.

23      Q.    A human being, somebody answered the

24  phone?

25      A.    Yes.

**Exhibit 1**                **page 118 of 183**

- David Friedlander -

Page 119

1    Q.    And then once it's answered the system

2    queues it up to --

3    A.    Subsecond transfer -- there's a

4    subsecond transfer to the agent with that skill

5    set who has been waiting the longest.

6    Q.    Okay.  Is there any information in the

7    account notes you have in front of you, the

8    printout, that reflects what happened during that

9    call that -- the first one on the first line of

10   ARS8?

11   A.    Yes.  The NA is what we call the result

12   code, and that's the code for no answer.  So the

13   call was made, it wasn't answered.

14   Q.    Had the call been answered and had

15   there been an available agent that was

16   transferred, would the agent have identified who

17   was calling?

18   A.    Are we speculating what might have

19   happened?

20   Q.    No.  I'm assuming there are training

21   policies and procedures about what happens when --

22   you have said it only goes to an agent who has the

23   proper skill set.  I assume there's some training

24   in terms of what happens.  So I assume when the

25   call connects the first thing that happens in some

- David Friedlander -

Page 120

1    way that agent qualifies the person on the other
2    line as the debtor; is that the first thing that
3    happens?
4          A.    It depends on the call.
5          Q.    Okay.  Well, I mean for this campaign,
6    if the daughter -- if the patient had answered the
7    phone, isn't the first thing that the agent would
8    do is make sure they are talking to the
9    responsible party or her husband?
10         A.    Yes.  They would go through --
11         Q.    That's what I mean by qualifying.
12         A.    They would go through a process of
13   identifying that they have a right party on the
14   phone.
15         Q.    Okay.  A right party.  And then once
16   they do that, they would identify who is calling?
17         A.    Yes.  Assuming they have the right
18   party on the phone, they will then identify the
19   name of the company, yep.
20         Q.    And when this particular call was
21   placed, the one we are talking about on March 3rd
22   of 2015, had the phone been answered and it was a
23   right party, would the agent have identified HRRG
24   or ARS?
25         A.    At that time they would have identified

**Exhibit 1**          **page 120 of 183**

- David Friedlander -

```
                                        Page 121
 1    HRRG.
 2         Q.    And the same is true for all calls
 3    placed to the Levins prior to the listing date of
 4    November 24, 2015; correct?
 5         A.    No, that's not correct.
 6         Q.    So would any calls placed to the Levins
 7    prior to November 24, 2015, have identified the
 8    caller as either ARS or ARS Account Resolution
 9    Services?
10         A.    No.
11         Q.    But they may not have identified
12    themselves as HRRG; correct?
13         A.    They may not use -- are you asking if
14    they may --
15         Q.    From your answer before that no -- my
16    prior question, I was assuming you were saying --
17    I think I asked that they would have been
18    identified as HRRG and you said no, they wouldn't
19    necessarily have been, not all the calls.  Isn't
20    that what you were saying?
21         A.    Well, my "no" had to do with the timing
22    of when calls would have started.
23         Q.    Okay.
24         A.    Outbound calling on this -- on the
25    Levins didn't begin until December 10th, according
```

- David Friedlander -

Page 122

1    to these notes.

2         Q.    December 10th of what year?

3         A.    2015.

4         Q.    What about the --

5         A.    From ARS.  Those notes were -- those

6    notes that you are looking at were imported from

7    HRRG.  Calls from ARS did not start until December

8    10, 2015.

9         Q.    To your knowledge, has HRRG produced

10   notes from the collection of -- the collection of

11   the debt by HRRG prior to when it was placed with

12   ARS, other than what's incorporated in these

13   notes?

14        A.    To my knowledge, no.

15        Q.    Have you reviewed those notes in

16   preparation for this deposition?

17        A.    No.  Only to the extent that they are

18   on the imported --

19        Q.    The imported ones.

20        A.    I have reviewed the imported notes.

21        Q.    Right, understood.  If you go down on

22   ARS8, down about, I'll say the line that

23   immediately precedes the line that starts with the

24   word "machine."  Do you see that?

25        A.    I'm not following.  Where?

- David Friedlander -

Page 123

1      Q.    There's a line that's --

2      A.    We are on ARS8 or ARS9?

3      Q.    8.  I'm sorry.

4      A.    Okay.  On 8, yep.

5      Q.    It's the sixth line down.

6      A.    Okay.  And you are looking at the line

7  preceding that?

8      Q.    Yeah.  Actually, before we get into

9  that.  Lines two and three, other than the dates

10  and times it's the same as the first line;

11  correct?  It shows the transaction, no answer, and

12  it was the campaign 1.

13      A.    Yes.

14      Q.    And then the third and fourth lines --

15  excuse me, the fourth and fifth lines show the

16  transaction no answer, that's also a call placed

17  but there's no campaign noted; correct?

18      A.    Yes.

19      Q.    And would either of those five -- first

20  five lines have had some notation if there was a

21  message left?

22      A.    Yes.

23      Q.    So the absence of any notation means

24  there was no message left, there was no answer?  I

25  guess if there's no answer you couldn't leave a

**Exhibit 1**          **page 123 of 183**

- David Friedlander -

Page 124

1    message; right?

2        A.    Right.

3        Q.    I guess those questions were silly, I'm

4    sorry.

5              The next line is the one -- the fifth

6    one that says HRG, GC.

7        A.    Yes.

8        Q.    And that refers to -- in July there was

9    a call placed at 11:26, I assume that's a.m., and

10   shows the phone number and says, "left message,

11   answering machine."  Do you see that?

12       A.    Yes, I see that.

13       Q.    So where it says "left message,

14   answering machine," is that a prerecorded message

15   or a live message or can you not tell?

16       A.    That was an -- I believe that's a

17   prerecorded message that was left.

18       Q.    Okay.  That prerecorded message would

19   not have identified the caller as ARS at that

20   call?

21       A.    That's correct.

22       Q.    Would it have -- it would have

23   identified HRRG?

24       A.    Yes, it would have.

25       Q.    Okay.  To be clear, when you mentioned

- David Friedlander -

Page 125

1    before some of the lines go onto the next line, I
2    assume it's spacing?
3        A.    Yes.
4        Q.    That's a two-line entry for one note;
5    correct?
6        A.    Yes.
7        Q.    Now, the next following line, which
8    shows the date of July 24, 2015 at 11:26, is that
9    still relating to the same message?
10        A.    I believe so.
11        Q.    Do you know what it means when it says
12    "active account"?
13        A.    I see the line you are referring to.  I
14    believe it is, but I'm not a hundred percent sure
15    of that.
16        Q.    Okay.  The next line, which is -- the
17    internal date there is July 28, 2015?
18        A.    Yes.
19        Q.    Do you see it refers to letter number
20    seven, final notice?
21        A.    Yes.
22        Q.    Is that a letter sent to the Levins?
23        A.    These are still referencing
24    transactional information that was imported into
25    ARS from HRRG's system notes.  And that final

**Exhibit 1**          **page 125 of 183**

- David Friedlander -

Page 126

1    notice "S" is a note pertaining to a letter sent

2    by HRRG to the Levins, yep.

3         Q.    And would that have been -- is there a

4    way to tell from these notes whether that was the

5    first letter that HRRG sent to the Levins?

6         A.    Is there a way to tell from these notes

7    that is --

8         Q.    Can you --

9              COURT REPORTER:  One at a time.

10        A.    -- by reading?  It's not a first

11   notice.  It's a final notice, it's not a first

12   notice.

13        Q.    So a fair implication from this

14   information is that there was at least one letter

15   prior to this letter that HRRG sent?

16        A.    Yes.

17        Q.    Is there any way you can tell from this

18   information how many were previously sent?

19        A.    No.  I'm looking back at prior notes,

20   and I can tell from looking at the prior notes

21   that there were -- there was an "A" notice sent,

22   there was a "B notice" sent prior to this.  So

23   there were two notices prior to this final notice

24   that went out that are indicated in these imported

25   notes --

**Exhibit 1**          **page 126 of 183**

- David Friedlander -

Page 127

```
1        Q.    Okay.

2        A.    -- you are looking at.

3        Q.    So let me ask you this, going back down

4   to ARS7, is that "A" notice, is that the entry on

5   1-27-15?

6        A.    Yes.

7        Q.    And is the "B" notice on 3-3-15?

8        A.    Yes.

9        Q.    Just to state what I think is obvious,

10  obviously the "A" notice and "B" notice made no

11  mention of ARS; correct?

12       A.    Correct.

13       Q.    On the -- picking up where we left off.

14  There's a line that says -- it starts requested;

15  do you see that?  And it looks like it's OLT7

16  index; do you see that line?

17       A.    Yes.

18       Q.    Is that referring to a different letter

19  form than the letter 7?

20       A.    No.

21       Q.    It's the same?

22       A.    It's part of that.  Yeah, it's just the

23  continuation of that line --

24       Q.    Got it.

25       A.    -- from above.
```

**Exhibit 1**          **page 127 of 183**

- David Friedlander -

1        Q.    Does the -- on ARS7, remember there's

2    the list of calls placed of 67, it was up there?

3        A.    Okay.  I'm on ARS7.  Where are we

4    looking?

5        Q.    Calls.

6        A.    Okay.

7        Q.    And it's a 67.

8        A.    Yes.

9        Q.    And you testified those were the number

10   of calls placed?

11       A.    Call attempts is what I explained.

12       Q.    Call attempts, you're right.  I

13   apologize.  The call attempts.  Is that count,

14   that number 67, does that include the ones that

15   were imported from HRRG or is that 67 just the

16   call attempts by ARS?

17       A.    I'm not sure.  I believe it's just ARS.

18       Q.    So we started talking about this letter

19   7 on that one line, and then there's a series of

20   entries that are on July 28th at 11:30 p.m.

21            MR. SCHEUERMAN:  We are back on 8?

22            MR. STERN:  Yes, sorry, back on 8.  I

23       apologize for not saying that.

24   BY MR. STERN:

25       Q.    There's a handful of lines that have

- David Friedlander -

Page 129

1    that same date.  Again, I assume I'm correct that

2    those all refer to the same -- or notes about the

3    same letter being sent; correct?

4         A.    We are still in the imported --

5         Q.    Yeah, the imported ones.

6         A.    -- notes?  And what line are we talking

7    about after requested?  Old --

8         Q.    The line --

9               COURT REPORTER:  One at a time.

10              MR. STERN:  Sorry.

11   BY MR. STERN:

12        Q.    The line immediately above requested,

13   because the date and time is July 28th at 11:30.

14        A.    Yes.

15        Q.    And all the ones that continued down,

16   and they are contiguous, that have that entry of

17   July 28, 11:30, all relate to our notes about the

18   sending of that one letter?

19        A.    Yes.

20        Q.    So we get down to -- there's two

21   entries for July 29, 2015.  It appears the first

22   one is still about that same letter; is that

23   correct?

24        A.    Yes.

25        Q.    And what's the second one on July 29th,

- David Friedlander -

Page 130

1    it has the time of 9:04?

2         A.    I'm not sure what that means.

3         Q.    Maybe hopefully I can do these by -- in

4    a group.  There's a series of ones that start on

5    September 9th at 10:58 and go through to November

6    9th at 8:55.  Are all those notes concerning calls

7    that were attempted?

8         A.    They are either notes concerning a call

9    that was attempted when the account was with HRRG

10   or a continuation of the preceding line.

11        Q.    It actually looks like, in looking at

12   it, that there are -- they come sort of in pairs.

13        A.    Yes.

14        Q.    So it refers to four different phone

15   calls that were attempted?

16        A.    That's what it appears to me, yep.

17        Q.    And in each of those it reflects a

18   message was left; correct?

19        A.    Yes.

20        Q.    And in each of those four calls the

21   message that was left identified the caller as

22   HRRG and not ARS; correct?

23        A.    Yes.

24        Q.    Now, the first entry on November 11th,

25   what does that mean, "stop zero letters"?

**Exhibit 1**        page 130 of 183

- David Friedlander -

1      A.    It's part of the process of returning

2    accounts to the billing system.

3      Q.    So I see there's -- I'm going to

4    estimate 10, 15 lines that are all dated November

5    11th at 10:42.  Is that -- all those notes relate

6    to the returning of the account to the billing

7    system?

8      A.    Yes.

9      Q.    Then we get to November 24th.  It looks

10   like there's three entries on November 24th at

11   9:04; do you see those?

12     A.    Yes.

13     Q.    And do those relate to then placing the

14   account with ARS?

15     A.    Yes.

16     Q.    Can you turn to ARS9, the next page?

17   Do you see beginning -- there is entries that

18   start on December 10th of 2015?

19     A.    Yes.

20     Q.    And then there seems to be similar

21   notations through the end of the page of paired

22   lines.  Do each of those paired lines reflect a

23   different call attempt in which a message was left

24   on the Levins' answering machine?

25     A.    I believe so.

**Exhibit 1**        **page 131 of 183**

- David Friedlander -

Page 132

1      Q.    And in each of those call attempts they

2   would have identified ARS as the caller?

3      A.    Yes, I believe so.

4      Q.    Is the same true for -- with respect to

5   the paired lines and the leaving messages as

6   reflected on ARS10?

7      A.    Yes.

8      Q.    And although on ARS11 not all of them

9   are paired lines but there looks to be like the

10  majority of those lines are the same kind of

11  paired lines, those also reflect that messages

12  were left?

13     A.    Only down to, I think, the fifth line,

14  and then you have PJB.

15     Q.    I see that.  But then it picks up on

16  9-20, do you see that, for the rest of the page?

17     A.    Yes.

18     Q.    That's why I said the majority of them,

19  just looking at it.  There's sort of three groups,

20  if you will --

21     A.    Yes.

22     Q.    -- the first five or six lines, and

23  then about four lines, and then probably more than

24  half of the rest of the page.

25     A.    Yes.

**Exhibit 1**              **page 132 of 183**

- David Friedlander -

Page 133

1     Q.   Let's talk about -- again, I assume if

2  we went through them one by one it would be the

3  same testimony, that those represent call attempts

4  in which a message was left and the message

5  identified the caller as ARS?

6     A.   Yes.

7     Q.   And those would all be the same

8  prerecorded messages?

9     A.   I'll say I think so.

10     Q.   Okay.

11     A.   Only because I don't know if there were

12  potentially other messages that may have been left

13  at some point in time.  But it does seem to

14  indicate that those are the same messages.

15     Q.   When you were describing a campaign

16  before and the process of the dialer making a call

17  and then if there's a live answer it hooks up the

18  agent that's been dormant the longest; right?  You

19  remember describing that?

20     A.   That's been waiting the longest.

21     Q.   What happens when it detects that it's

22  an answering machine?  Is there a standard

23  procedure that happens when it's an answering

24  machine, or is it -- does it vary?  What happens?

25     A.   When an answering machine is detected

- David Friedlander -

Page 134

1   by the system it looks at the settings in the

2   specific calling campaign and chooses the action

3   it performs based on the calling campaign

4   instructions definition.

5        Q.    Whether the account is with HRRG or

6   ARS, and obviously if it's ARS it's with HRRG, but

7   either way, is there ever a time when if an

8   answering machine is detected that it just hangs

9   up and doesn't leave a message?

10       A.    Yes.

11       Q.    I mean, that's intentional, that

12  sometimes you do that?

13       A.    Yes.

14       Q.    On page ARS11, the line entries that

15  are not records of call attempts, are those all

16  information relating to scrubs?

17       A.    No.

18       Q.    Which ones were not?  Are any of them

19  relating to scrubs?

20       A.    Yes.

21       Q.    Can you indicate which ones are and

22  which ones are not?

23       A.    There are lines that have the initials

24  LN.

25       Q.    Yes.

**Exhibit 1**        **page 134 of 183**

- David Friedlander -

Page 135

1        A.    LN stands for Lexus Nexus.  That is

2    indicative of a different process where we are

3    looking for demographic information such as an

4    address update or a phone update.

5        Q.    Okay.   And the others are scrubs?

6        A.    Yes.

7        Q.    Obviously the ones that say banco,

8    that's a scrub?

9        A.    Yes.

10        Q.    If you turn to ARS12, the entries up

11    through and including the January 19, 2017, those

12    reflect call attempts where there was an answering

13    machine and a message -- prerecorded message was

14    left; correct?

15        A.    Yes.

16        Q.    And those messages identified the

17    caller as ARS?

18        A.    Yes.

19        Q.    And then there's one on February 7,

20    2017, does that notation mean there was no message

21    left?

22        A.    Yes.

23        Q.    And then there's two lines on February

24    10th of 2017, does that refer to notes that were

25    entered as to the statute of limitations date on

**Exhibit 1**        **page 135 of 183**

- David Friedlander -

Page 136

1   that debt?

2        A.    Yes, I believe so.

3        Q.    And then the remaining entries are on

4   February 17th of 2017, which is the date the

5   report was created.  Is that where the information

6   was put in about the fact that the Levins had

7   counsel?

8        A.    Yes.

9        Q.    Is there anything in the printout of

10  the notes which reflects whether there was any

11  credit reporting on this day?

12       A.    No, there isn't anything that I see

13  that indicates credit reporting.

14       Q.    Does the absence of that information

15  indicate there was no credit reporting?

16       A.    I don't know.

17       Q.    Okay.  Does ARS, excuse me, a debt

18  that's placed with ARS -- strike that.

19            Does ARS do any credit reporting --

20       A.    Yes.

21       Q.    -- for any accounts?

22            Do they do it for all accounts?

23       A.    No.

24       Q.    And what about accounts placed just on

25  HRRG but not with ARS, are there -- are those --

**Exhibit 1**          **page 136 of 183**

- David Friedlander -

Page 137

1    are there accounts that are credit reported?

2         A.    No.

3         Q.    HRRG does not credit report?

4         A.    That's correct.

5              MR. STERN:  Let's take a ten-minute

6         break.

7              MR. SCHEUERMAN:  Are we getting out of

8         here today?

9              MR. STERN:  That's one of the things I

10        want to look at and go over where I'm at.  We

11        covered a lot of stuff with going through the

12        account notes, so let me see what I have got.

13             (Whereupon there was a recess in the

14        proceedings from 3:08 to 3:24 p.m.)

15   BY MR. STERN:

16        Q.    There was an account number that's on

17   the account notes that is an account number that's

18   used by ARS to identify this debt; correct?

19        A.    Can you be more specific?  Can we make

20   sure that we are talking about the same thing?

21        Q.    In D-2, the first page of the printed

22   account notes.

23        A.    Okay.  Yes, I have that.

24        Q.    There is an account number listed on

25   there.

**Exhibit 1**            **page 137 of 183**

- David Friedlander -

Page 138

1    A.    Yes.

2    Q.    When the debt was listed with HRRG

3  prior to it being listed with ARS, did it have the

4  same account number?

5    A.    No.

6    Q.    Is there any information in the account

7  notes or other documents that you have or that you

8  reviewed that identifies the account number that

9  was used by HRRG before -- when it was collecting

10  it before it was assigned to ARS?

11    A.    I'm not sure.  There is a -- the answer

12  is I'm not sure.

13    Q.    Okay.

14    A.    The client account number appears on

15  this exhibit here.

16    Q.    The client account number.  I assume

17  the client had many debts that were placed with

18  HRRG and with ARS under that account number --

19    A.    No.

20    Q.    -- under the client number.

21    A.    That's a client number, okay.  There's

22  a client code and a client account number.

23    Q.    I'm sorry.  So which were you referring

24  to, client account number --

25    A.    The client account number is --

**Exhibit 1**          **page 138 of 183**

- David Friedlander -

Page 139

1      Q.    The account number that the creditor or
2   the billing company refers --
3      A.    Refers to this individual account.
4      Q.    And so ultimately, the reason I was
5   asking whether there was an account number when it
6   was on the HRRG side is whether you would be able
7   to get a printout of the account notes of this
8   account when it was on the HRRG side.
9      A.    Yes, I can get that.
10     Q.    Okay.  And to your knowledge, those
11  account notes would still be on the system or
12  retrievable from archives?
13     A.    I believe so.
14          MR. STERN:  Mark this D-4.
15          (Exhibit D-4, Transcript of message,
16      marked for identification, as of this date.)
17  BY MR. STERN:
18     Q.    I'm showing what is marked as D-4.
19  I'll tell you it's a document that I prepared, but
20  it is taken from the complaint that was filed in
21  this case, which is a -- which contains a
22  transcript of the message that -- or of the --
23  there were three messages that we identified in
24  the complaint or we identified to -- our clients
25  had I guess preserved and retrieved that all sound

**Exhibit 1**              **page 139 of 183**

- David Friedlander -

Page 140

1    identical, I'm representing to you they sound

2    identical, and that this is the transcript of

3    those messages.  What I have done though is break

4    them out by sentences and just in bracketed

5    numbers so in discussing it we can refer to

6    particular sentences, that's why I did it that

7    way.

8            What I'm going to do first is before we

9    go any further is play one of the messages that I

10   have so you can be satisfied that, you know -- or

11   correct if there is any correction that needs to

12   be made in this transcript that's marked as D-4.

13           MR. SCHEUERMAN:  I object to the form.

14       Again, this is counsel's document that he

15       prepared.  It's not something that is in

16       discovery.  But go ahead.

17           Before you play.  What are you playing

18       it from, the complaint that was filed?

19           MR. STERN:  The complaint filed -- does

20       the complaint that was filed have an embedded

21       file?

22           MR. SCHEUERMAN:  Whatever you are

23       playing it from just identify it.

24           MR. STERN:  Assuming it would work,

25       there's a sound file embedded in the

**Exhibit 1**                    **page 140 of 183**

- David Friedlander -

Page 141

1        electronically filed or amended complaint,

2        which is document 9 on the court's docket.

3        This is -- the link to it is adjacent to

4        paragraph 32 of the amended complaint.

5        That's what I'm going to double click on.

6              I am going to play one of the

7        electronic files that I provided in discovery

8        instead because the complaint embedded did

9        not work that I had provided in discovery to

10       Mr. Scheuerman.

11             (Audiotape played.)

12    BY MR. STERN:

13       Q.    Did you hear that?

14       A.    Yes.

15       Q.    Does that sound like the prerecorded

16    messages that ARS used?

17       A.    Yes, it sounds like it.  It is missing

18    at the beginning of it I think the words "this

19    is."

20       Q.    Okay.  Was there an -- in creating the

21    prerecorded message, were there any constraints,

22    that you are aware of, in terms of how long in

23    terms of the time the message could be?

24       A.    I'm not aware of any.  I'm sure there

25    are, I'm not aware of any.

**Exhibit 1**                    **page 141 of 183**

- David Friedlander -

Page 142

1        Q.    If you would turn to I think D-2, ARS4.

2    It's the letter.

3        A.    Yes.

4        Q.    I'm just pointing that out to recall to

5    you your earlier testimony that the letters ARS

6    was put in parenthesis in the body of the letter

7    as suggesting -- as indicating that that was going

8    to be a shortened form of ARS Account Resolution

9    Services; right?  Do you recall that?

10       A.    Yes.

11       Q.    So that someone reading that letter,

12   when they would see ARS standing alone that they

13   would understand from that letter that ARS meant

14   ARS Account Resolution Services; correct?

15       A.    Correct.

16       Q.    And they could do that without having

17   to call ARS or HRRG; correct?

18       A.    Correct.

19       Q.    And they could do that without going to

20   any website; correct?

21       A.    Correct.

22       Q.    Is there anything in the telephone

23   message that would alert the listener to the fact

24   that ARS was a shortened version of ARS Account

25   Resolution Services?

- David Friedlander -

Page 143

1      A.    Can you repeat the question?

2            MR. STERN:  Can you read that back?

3            (Record read.)

4            MR. SCHEUERMAN:  I object.  How is this

5      related to the true name issues?  It seems to

6      be related to your issue that your clients

7      were confused when they got the message.  How

8      is this related to true name?  That's my

9      objection.

10           MR. STERN:  You are seriously raising

11     that?  I'm flabbergasted that you would make

12     that objection to that question.  Please step

13     out, Mr. Friedlander.

14           (Witness leaves the room.)

15           MR. STERN:  The court said that the

16     three factual issues is whether, quote

17     unquote, ARS is HRRG's full business name, a

18     commonly used acronym of its registered name,

19     ARS Account Resolution Services, or a name

20     under which it usually transacts business.

21           MR. SCHEUERMAN:  Okay.

22           MR. STERN:  Okay.  Well, so it used

23     ARS.  I'm trying to find out --

24           MR. SCHEUERMAN:  Can you read back the

25     question?

**Exhibit 1**              **page 143 of 183**

- David Friedlander -

Page 144

```
1           MR. STERN:  He identified a letter
2      where it said this is what ARS is.  All I did
3      was ask him is -- you know, without having to
4      place a phone call, without having to go on
5      the Internet, that on the face of the letter
6      he's testified that you could know that ARS
7      means ARS Account Resolution Services.  So I
8      asked him if there's anything in this
9      telephone message which would alert the
10     listener -- to inform the listener as to
11     whether ARS means ARS Account Resolution
12     Services.  That goes directly to whether it's
13     a commonly used acronym of it's a registered
14     name.
15          I think this is a critical issue.  The
16     fact that you can even suggest that this
17     might be outside the scope of discovery is --
18     I can't even get my head around that.
19          MR. SCHEUERMAN:  The fact that it uses
20     it in the thing is what proves -- is what is
21     relevant in terms of discovery for the judge.
22     The fact whether it alerts it to what the
23     actual name -- how does that make any sense?
24          MR. STERN:  You argued to the district
25     court and court of appeals that the inclusion
```

- David Friedlander -

1      of the phone number and the inclusion of the

2      web address allowed the consumer to identify

3      the caller.

4           MR. SCHEUERMAN:  That's a different

5      issue.  That's a totally different issue.

6      That's whether the caller -- whether the

7      consumer would be confused.  It's not the

8      issue of whether they typically transact

9      business as ARS or whether it's a commonly

10     acronym.

11          MR. STERN:  Whether they are confused

12     is still part of the case.

13          MR. SCHEUERMAN:  It's not.  That's not

14     the true name.  The judge said it's the true

15     name issue.  It's not whether it's confused.

16          MR. STERN:  And the true name issue --

17          MR. SCHEUERMAN:  It's not whether they

18     would associate the name with another debt

19     collector as you pointed out, that could be a

20     germane issue later.  But the true name issue

21     is whether it's their full business name,

22     whether they usually transact business, or

23     whether it's a commonly used acronym.  So

24     that question doesn't relate to that.  It

25     relates to your issue as to whether the

**Exhibit 1**          **page 145 of 183**

- David Friedlander -

Page 146

1    consumer would think it would be another debt
2    collector, which is a different issue.
3         MR. STERN:  So the third circuit
4    dealing with the true name issue said we
5    adopt FTC commentary; correct?
6         MR. SCHEUERMAN:  That's not the --
7    Judge Williams narrowed it down to those
8    issues in the true name issue.
9         MR. STERN:  No.  Her order said the
10   true name issue is what she said.
11        MR. SCHEUERMAN:  The order before that
12   says those are the issues.  Whether it's --
13        MR. STERN:  No, it's not what she said.
14        MR. SCHEUERMAN:  -- ARS -- whether it's
15   the full business name, the name under which
16   it transacts business, or commonly used
17   acronym.  With this perspective -- that's
18   what discovery is limited to.
19        MR. STERN:  That's not what -- her
20   order says --
21        MR. SCHEUERMAN:  This has attorney
22   notes on it.
23        COURT REPORTER:  One at a time.
24        MR. STERN:  Fine.  Identify what you
25   are reading from.

**Exhibit 1**                        **page 146 of 183**

- David Friedlander -

Page 147

```
 1              MR. SCHEUERMAN:  The 11-7-2018 order.
 2              MR. STERN:  The 11-7-18 order says --
 3      gives reasons and then says, "It is with this
 4      perspective," so in other words that informed
 5      the court, "that the court views the parties'
 6      dispute relating to the discovery being
 7      sought in the case at this juncture and
 8      determines that the discovery is limited to
 9      that which is necessary to the claims and
10      defenses under section 1692(e)(14), as this
11      is the only claim that remains in the case."
12              So she didn't limit it to the issues.
13      Her discussion of the third circuit is what
14      informed her to say the discovery is limited
15      to (e)(14).
16              MR. SCHEUERMAN:  I disagree.
17              MR. STERN:  You can disagree, that's
18      what it says.
19              MR. SCHEUERMAN:  The subsequent order
20      says it's limited to the true name issue.
21      And the third circuit, they identified the
22      true name issue is whether it's the true name
23      under which they usually transact business or
24      commonly used acronym.
25              MR. STERN:  That's not what they
```

800-227-8440                                              973-410-4040

**Exhibit 1**              **page 147 of 183**

- David Friedlander -

Page 148

```
 1      limited it to.
 2           MR. SCHEUERMAN:  Which is what the
 3      judge's order --
 4           MR. STERN:  You have -- can you mark
 5      the question that was asked about it?
 6           Do you have a speakerphone so we can
 7      call the judge?
 8           (Phone call with Judge's paralegal.)
 9           MR. STERN:  This is Phillip Stern.  I'm
10      calling from the deposition Levins versus
11      Healthcare Revenue Recovery Group.  We have
12      an issue -- a question and objection that I
13      would like the Judge to rule on.
14           PARALEGAL:  What case is this
15      regarding?
16           MR. STERN:  It's Levins versus Health
17      Care Revenue.  It's case 17928.
18           PARALEGAL:  Okay.  And I'm sorry, you
19      are in a deposition of whom?
20           MR. STERN:  It's the deposition of the
21      corporate representative for the defendant.
22           PARALEGAL:  Okay.  And you are in the
23      conference room now and you have me on
24      speaker?
25           MR. STERN:  Yes.
```

**Exhibit 1**          **page 148 of 183**

- David Friedlander -

```
                                              Page 149

 1          PARALEGAL:  Okay.  And you have a court

 2     reporter in the room as well?

 3          MR. STERN:  Yes.  And the court

 4     reporter is ready to read back the question

 5     and also to record.

 6          PARALEGAL:  Okay.  All right.  Let me

 7     put you on hold, get -- the judge is

 8     finishing up her initial conference in

 9     another matter so you may have to hold for a

10     few minutes.

11          MR. STERN:  Okay, thank you.

12  BY MR. STERN:

13     Q.    Do you have D-3, that's the answers to

14  interrogatories?

15     A.    Yep.

16     Q.    Do you have a pen?  On D-4, the

17  transcript, D-4 is that transcript.

18     A.    Yes.

19     Q.    You said you think on the first line

20  the words "this is" is missing?

21     A.    Yes.

22     Q.    Could you just sort of write that in,

23  write that in, carrot that in?

24     A.    (Witness complies.)

25     Q.    You are comfortable that that is now an
```

- David Friedlander -

Page 150

1   accurate transcript of what the message that you

2   understood was left?

3        A.    Yes.

4        Q.    So if you could go to D-3, the

5   interrogatories.

6        A.    Yes.

7        Q.    If you would turn to interrogatory

8   number 8.

9        A.    Uh-hum.

10        Q.    And for the record, I'm going to read

11   the question or the request.  First, 8, "State

12   each name, acronym, and abbreviation under which

13   Healthcare Revenue Recovery Group, LLC has

14   identified itself to others since its formation,

15   and for each include dates when the name, acronym,

16   or abbreviation was first used and last used."

17             You see then below that there is an

18   answer, and the first word it says "objection," do

19   you see that?

20        A.    Yes.

21        Q.    And then there's -- the next sentence

22   states an objection?

23        A.    Yes.

24        Q.    And then the next sentence starts,

25   "Without waiving same," in other words, without

- David Friedlander -

Page 151

```
 1   waiving the objection, it says, "ARS Account
 2   Resolution Services began operations in January
 3   2009."
 4           Do you see that?
 5       A.   Yes.
 6       Q.   I believe you testified that HRRG was
 7   formed in 2004 and started operations doing debt
 8   collection shortly after that, I assume, before
 9   the end of 2005; is that an accurate time frame?
10       A.   Yes.
11       Q.   The operations -- so HRRG was operating
12   without this ARS business unit until January of
13   2009; correct?
14       A.   Yes.
15       Q.   So what it's saying here is that ARS
16   Account Resolution Services began operations.
17   That means just that one business unit, not that
18   HRRG began operations in 2009?
19       A.   That's correct.
20       Q.   Okay.  If you look down to now number
21   10, what's -- why don't you read it to yourself,
22   the question and answer, so you're more familiar
23   with it?
24       A.   Yes.
25       Q.   And just rather than reading the whole
```

- David Friedlander -

1    thing, the last, sort of, phrase -- the last

2    sentence says, "And since then," you see that?

3         A.    Yes.

4         Q.    "And since then" is referring to since

5    January of 2009; correct?

6         A.    Yes.

7         Q.    "And since then, ARS is the name under

8    which it usually transacts business with the

9    public."  Do you see that?

10        A.    Yes.

11        Q.    The pronoun "it," does that refer to

12   HRRG or refer only to the business unit that

13   operates as ARS Account Resolution Services?

14        A.    That refers only to the business unit

15   ARS.

16        Q.    With respect to the same question

17   number 8, it --

18             MR. SCHEUERMAN:  Which question?

19             MR. STERN:  I'm sorry, question 10.  I

20        apologize, question 10.

21   BY MR. STERN:

22        Q.    It talks about transacts business with

23   the public.  Do you see that at the end of the

24   sentence?

25        A.    Yes.

**Exhibit 1**         **page 152 of 183**

- David Friedlander -

Page 153

1      Q.    You understand this is your -- the
2  answer that you certified to; do you understand
3  that?
4      A.    Yes.
5      Q.    What did you mean by "the public"
6  there?
7      A.    The consumers who had accounts that
8  reached the later stage of delinquency, vendors
9  through which we did business, our website.
10      Q.    When you say "our" --
11            MR. SCHEUERMAN:  Can you let him
12      finish?  Go ahead.  Were you done?
13            THE WITNESS:  No.
14            MR. SCHEUERMAN:  Go ahead.
15      A.    The website, the notices that we sent
16  out to consumers.  I think that's it.
17            MR. STERN:  Can you read the answer
18      back?
19            (Record read.)
20  BY MR. STERN:
21      Q.    You used the first person plural when
22  you said "we" or "our."  I think when you are
23  referring to vendors you said, "we did business
24  with."  When you say "we," do you mean HRRG or do
25  you mean the ARS business unit?

**Exhibit 1**          **page 153 of 183**

- David Friedlander -

Page 154

1      A.    I'm answering for the ARS business

2  unit.

3      Q.    It's the same for each time you used

4  "our" or "we," that was referring just to the ARS

5  business unit; correct?

6      A.    I believe so.

7      Q.    I mean, I can have her read back the

8  answer again if you would like.

9      A.    Yeah, let's read it back again.

10         (Record read.)

11     A.    Can you start with the question that

12  preceded that response?

13         THE JUDGE:  Hello.

14         MR. STERN:  We are here, Your Honor.

15     While we were waiting we put it on mute for a

16     moment.

17         THE JUDGE:  Okay.

18         MR. STERN:  That's why, I'm sorry, I

19     didn't jump on real quick.

20         This is Phillip Stern, plaintiff's

21     counsel.  I can certainly give the court

22     whatever background it needs, but we have

23     been deposing Mr. Friedlander, the 30(b)(6) 6

24     representative for Healthcare Revenue.

25         And I asked a question that related to

**Exhibit 1**          page 154 of 183

- David Friedlander -

Page 155

```
1       the voicemail message that was left.  Earlier
2       in the deposition there was examination about
3       a letter that had been sent to my clients by
4       the defendant, about eight months prior to
5       the messages, where the letter, and I can
6       cite -- it is on the docket if Your Honor
7       wants to view it.  But essentially the letter
8       opens by saying that the letter is from ARS
9       Account Resolution Services, which is the
10      full alternate name that's been registered
11      with the State of New Jersey.  And then in
12      parenthesis after that name said ARS.  And
13      the witness testified that that ARS in
14      parenthesis was -- indicated that it was a
15      short name of the full alternate name that
16      was in the letter.  So that wherever ARS
17      appeared later in the letter the reader would
18      know that it was referring to ARS Account
19      Resolution Services.
20           And the witness testified that that way
21      the reader would not have to call the phone
22      number or go to the website to find out who
23      was sending them the letter.
24           The argument has been made by defendant
25      that -- when you get to the message that,
```

- David Friedlander -

Page 156

1    which never mentioned -- it did not mention

2    the full alternate name that was the

3    registered alternate name -- that it just

4    says ARS.  But the argument has been made

5    that had they called the phone number or gone

6    to the website they could have found out.

7         So I asked a question, and the court

8    reporter is prepared to read it back as a

9    follow-up to that, which counsel objects to

10   as being outside the scope of the discovery

11   limitations.  And my view is it actually goes

12   to the very core of what the litigation is

13   about.  So I'll ask the court reporter to

14   read that question back to, Your Honor.

15        THE JUDGE:  Go ahead.

16        (Previous testimony is read.)

17        THE JUDGE:  What's the objection to

18   that?

19        MR. SCHEUERMAN:  Your Honor, this the

20   Chris Scheuerman.  My objection is that goes

21   to a different issue.  Issues were raised in

22   connection with a motion to dismiss that

23   since they were using ARS the consumer would

24   be confused and think it was from another

25   debt collector and, therefore, violate the

**Exhibit 1**            **page 156 of 183**

- David Friedlander -

Page 157

1      FDCPA.  In reading Your Honor's decision or
2      order yesterday that says it's limited to the
3      true name, and then the November 2008 order,
4      the third circuit drew the narrow issue is
5      whether -- the issue is whether it's ARS's
6      full name, a name under which it usually
7      transacts business, or a commonly used
8      acronym.  So, you know, the fact that they
9      just use it in the message, I think that is
10     obviously discoverable.  But whether the
11     plaintiff would be confused, that's a
12     different issue than what the narrow issue,
13     respectfully, my interpretation of Your
14     Honor's order gives.  It goes to a different
15     issue.  It doesn't go to whether it's the
16     name they usually transact business using or
17     whether it's a commonly used acronym.
18          THE JUDGE:  Counsel, you can make
19     whatever arguments you want to make about the
20     fact that after -- I think this question, as
21     I understand it, what I heard was is there
22     anything in the voice message to suggest to
23     you that it was ARS.  You are analyzing the
24     question and potential answer.  You are not
25     objecting based on my orders.  That's not

**Exhibit 1**          **page 157 of 183**

- David Friedlander -

1    what we are here for.  The deposition is for

2    discovery to obtain factual information, and

3    that's question is pertinent.

4         What's the next question?

5         MR. STERN:  Your Honor, the only other

6    issue was something we had earlier, I was

7    trying to understand how this business

8    operates.  And it's a little different than

9    what I, sort of, intuitively thought about a

10   debt collector.  It doesn't act -- what I

11   learned through the deposition, it doesn't

12   act independently.  Apparently it's one

13   company amongst a group of companies --

14   related companies that are under some kind of

15   either common ownership or umbrella or -- but

16   some kind of structure, but counsel would not

17   let me probe into this, where they sell

18   billing and collection services, the whole

19   gamut, to healthcare providers.  So the

20   healthcare provider -- so all the billing

21   from the get-go through when it's in default

22   and delinquency.  So there are companies --

23   related companies that are just billing

24   companies.  And, in fact, HRRG began as being

25   severed as doing the debt collection work

**Exhibit 1**          **page 158 of 183**

- David Friedlander -

Page 159

1    severed off from a billing company that did

2    both billing and collections. And that goes

3    back over 20 years ago. And that -- so HRRG

4    does collection once the billing company

5    feels that it's at the point where it now has

6    to go to collection. So the account gets

7    transferred. All that's internal. They

8    don't have any outside creditors coming to

9    them to place accounts, that's all within the

10    same family.

11        And then what I also learned is that

12    within HRRG about a third of their business

13    is accounts that HRRG has, sort of, exhausted

14    their efforts and now these are, sort of,

15    like super delinquent debts, and they go to

16    what the witness described as a business unit

17    within HRRG, for which they use the label

18    ARS.

19        I just asked the witness, you know,

20    what's the name of the parent? What's the --

21    is there a name under which or this group or

22    family of companies is called? And counsel,

23    under the same -- based upon Your Honor's

24    orders limiting discovery said I wasn't

25    allowed to get that information.

**Exhibit 1**        **page 159 of 183**

- David Friedlander -

1          MR. SCHEUERMAN:  He was looking for
2      discovery, it wasn't -- it's not relevant to
3      the issue.  First of all, the fact that he
4      can recite all this stuff is that he was able
5      to ask questions about it at the deposition.
6      He was getting into the corporate
7      organization which Your Honor during the call
8      my notes reflect that you specifically said
9      that that was too broad.  He was going into,
10     What are the parent companies?  Is HRRG a
11     subsidiary of anything?  It's not relevant to
12     the narrow issues that Your Honor laid out in
13     her orders.
14          MR. STERN:  Your Honor, if I could just
15     briefly --
16          THE JUDGE:  Hold on.  Plaintiff needs
17     to understand who the defendant is.  By
18     giving your recitation, Mr. Stern, I think
19     you already do.  I'm not sure what the
20     question is.
21          MR. STERN:  Your Honor, all I want to
22     do is put a name on it.  I'm thinking of --
23     I'm writing a summary judgment brief and I
24     want to say, you know, HRRG is a member of
25     the Acme family of companies that provided,

**Exhibit 1**          page 160 of 183

- David Friedlander -

Page 161

```
 1          you know, billing collection services to the
 2          healthcare industry.  That's really what I
 3          had in mind.  I wasn't going that far.  I
 4          don't need to know who the, you know, CFO is
 5          of the corporate parents or whether they are
 6          publicly traded or not.  I just wanted to
 7          know it.  Quite frankly, I think knowing this
 8          information is probably stuff that ought to
 9          be disclosed in a disclosure form anyway.
10               MR. SCHEUERMAN:  It is.  He can look at
11          my corporate disclosure form.  It was filed
12          on the docket, if that's all he wants.
13               THE JUDGE:  Right.  That's what I
14          thought immediately.
15               MR. STERN:  Maybe I didn't look.
16               THE JUDGE:  When a corporate defendant
17          files its initial filing they have to do
18          their corporate designation form.
19               MR. STERN:  I'm looking at it right
20          now.
21               MR. SCHEUERMAN:  I can't -- I think
22          there is a parent company, I can't picture it
23          in my mind.  Again, whether there's a parent
24          company and how that -- anything about the
25          parent company, I'm not sure how that relates
```

**Exhibit 1**          **page 161 of 183**

- David Friedlander -

Page 162

1      to the true name issue of whether ARS

2      typically transacts business as ARS.

3            THE JUDGE:  It may not directly satisfy

4      that inquiry, but every party gets to know

5      who the other party is and so -- I'm trying

6      to find the corporate form.

7            MR. STERN:  Your Honor, I just looked

8      at the corporate disclosure form, it's docket

9      6.  It says that HRRG, the defendant, does

10     not have a parent.  But I have a document

11     that I found on -- an Internet document

12     that -- actually one of their vendors who

13     provided them some software technology had

14     them on as a, I guess as a case study.  And

15     it says, "Healthcare Revenue Recovery Group,

16     a Division of TeamHealth.  One of the largest

17     supplies of outsourced professional staffing

18     and administrative services."  So I wanted to

19     ask about --

20           THE JUDGE:  You can ask that very

21     limited question.

22           MR. STERN:  Okay.

23           THE JUDGE:  That's it.  That's it.

24           MR. STERN:  That's fine.  I don't need

25     to explore.  That's all I want to find out.

**Exhibit 1**          **page 162 of 183**

- David Friedlander -

Page 163

1          THE JUDGE:  The corporate disclosure

2     statement -- the only reason I'm allowing you

3     to do that is because you seem to have opened

4     information or discovered information

5     contrary to the corporate disclosure

6     statement and that's a problem.

7          MR. STERN:  Okay.  I don't think

8     there's anything --

9          THE JUDGE:  But that's it, Mr. Stern.

10    You are not going into anything else just you

11    have articulated a basis for your question

12    that, in fact, goes to the identity of the

13    corporate entity.  And that is not within the

14    scope of the limited discovery I talked about

15    but that is essential background information.

16    You get to know who you are seeing and/or who

17    is suing you.

18          MR. STERN:  I don't intend to go with

19    any depth.  It's one or two questions at

20    most.

21          MR. SCHEUERMAN:  Thank you, Your Honor.

22          MR. STERN:  Thank you, Your Honor.

23          THE JUDGE:  You are welcome.  Have a

24    good day.

25          (Witness returns.)

**Exhibit 1**              **page 163 of 183**

- David Friedlander -

Page 164

1          MR. STERN:  We are back on the record.
2   BY MR. STERN:
3      Q.    I'm going to ask the court reporter to
4   repeat the question that was pending when your
5   counsel objected.
6          (Record read.)
7      A.    Not that I see.
8      Q.    Is HRRG a subsidiary of another company
9   or corporation?
10     A.    No.
11     Q.    So it does not have -- there's no
12  parent?
13     A.    No.
14     Q.    Back to D-3, the interrogatories.  If
15  you can go to -- actually, why don't you read to
16  yourself question 21 and the answer, then I have a
17  question for you about the answer.
18     A.    Okay.
19     Q.    Okay.  My question is specific to one
20  sentence, which is the first sentence of the last
21  paragraph of that answer.  I think it's on the
22  next page.  I'm going to read that sentence for
23  purposes of the record.
24          "In all telephone communications with
25  consumers, defendant's employees exclusively

**Exhibit 1**          **page 164 of 183**

- David Friedlander -

Page 165

1    utilize the 'ARS' name."

2         A.    Yes, I see that.

3         Q.    When you used the letters ARS you put

4    that in quotes in the answer, did you mean

5    literally just those three letters, ARS, or were

6    you referring -- in other words, does that mean

7    they don't use ARS Account Resolution Services?

8    It says they exclusively used the ARS name.  I'm

9    asking, when you say -- I'm asking, does that mean

10   they exclusively use only those three letters or

11   when you used those three letters you are

12   referring to both those three letters and the full

13   ARS Account Resolution Services?

14        A.    I mean either one.

15        Q.    Okay.  Right.  So they use either one

16   exclusively?

17        A.    Right.

18        Q.    I just didn't know if it was more

19   limited than that.

20             Are you aware that this case was

21   initially dismissed and went on appeal and the

22   appellate court reversed the decision and now it's

23   back where we are litigating it now?

24        A.    Yes.

25        Q.    Were you ever provided a copy of the

- David Friedlander -

Page 166

1   decision from the appellate court?

2        A.    Yes.

3        Q.    Do you recall reading it?

4        A.    Yes.

5        Q.    In the court's decision, I'm going to

6   read from the court's decision.  I want to ask you

7   a question about it.

8        A.    Is it in any of the exhibits that we

9   had?

10        Q.    It's not, but I can mark one and give

11   it to you.  That would probably be easier.

12             (Exhibit D-5, Court's decision, marked

13        for identification, as of this date.)

14   BY MR. STERN:

15        Q.    On D-5, if you look at the third

16   page --

17             MR. SCHEUERMAN:  What page?

18             MR. STERN:  The third page.

19   BY MR. STERN:

20        Q.    There's page numbers on the bottom

21   right corner.  So on page 3, it's the paragraph

22   that follows the indented quote that begins, "At

23   the time the Levins," do you see that?

24        A.    Yes.

25        Q.    If you go down to three or four lines

**Exhibit 1**          **page 166 of 183**

- David Friedlander -

Page 167

1    to the right, it's the last sentence, it says,

2    "While it has registered," do you see that?

3         A.    Yes.

4         Q.    I'm going to read that sentence.

5    "While it has registered the name ARS Account

6    Resolution Services in New Jersey, HRRG has

7    neither registered the standalone name ARS, nor

8    taken any other legal steps to do business under

9    that specific name."

10             Are you aware of any facts which

11   contradict the statements made in that sentence?

12             MR. SCHEUERMAN:  Objection to form.  Do

13        you want me to put the form objection on the

14        record or do you want me to tell him to

15        leave?

16             MR. STERN:  If it's just to form

17        then -- you don't have to go into substance.

18             MR. SCHEUERMAN:  I respect how you do

19        it.  I do it a different way, I like to

20        preserve the record.  I'm going to put it on

21        the report.  He can stay or leave.

22             MR. STERN:  Have him step out.  I don't

23        know what you are going to say.

24             (Witness leaves the room.)

25             MR. SCHEUERMAN:  I just note that the

**Exhibit 1**          **page 167 of 183**

- David Friedlander -

Page 168

1     opinion references legal steps and is calling

2     for a legal conclusion.  I don't know if this

3     witness is qualified to answer.

4          MR. STERN:  Okay.

5          (Witness returns.)

6  BY MR. STERN:

7     Q.    Do you remember the question?

8     A.    No.

9     Q.    So if you want to take a moment, maybe

10  reread that last sentence.  You know which one?

11    A.    "While it has registered the name?"

12    Q.    Yes.

13    A.    Okay.

14    Q.    Are you aware of any facts which

15  contradict any of the statements made in that

16  sentence?

17    A.    I don't think so.

18    Q.    When you say you don't think so, that

19  suggests you might have some doubt.  What's the

20  basis for your doubt?

21    A.    Yeah, because I don't know if filing

22  for d/b/a is the same or different from

23  registering.

24    Q.    Okay.  So I'm happy to clarify that.

25  I'm willing to treat that registering that name is

**Exhibit 1**          **page 168 of 183**

- David Friedlander -

Page 169

```
 1    the same as filing a d/b/a.  In other words, I'm
 2    saying you can assume that --
 3         A.    Registering -- saying it's registered
 4    is the same if we filed for the d/b/a.
 5         Q.    Yes, I'm saying that's the same.  You
 6    can treat that as the same in terms of
 7    understanding this.
 8               MR. SCHEUERMAN:  Objection.
 9         A.    Okay, then this might be wrong.
10         Q.    What would be wrong?
11         A.    Because I think we have and had at that
12    time filed for a d/b/a under the name ARS Account
13    Resolution Services.
14         Q.    I think the sentence is saying that you
15    did register that name in New Jersey.  It's saying
16    while it has registered the name in New Jersey.
17         A.    Yep.  Okay.
18         Q.    Then it says -- what it's saying is
19    what HRRG did not do is, which is neither
20    registered the standalone name ARS, nor taken any
21    other legal steps to do business under that
22    specific name.  I think they mean that specific
23    name is the standalone ARS.
24         A.    All right.  Then in this case then I
25    would say --
```

- David Friedlander -

Page 170

1        Q.      This is a truthful statement?

2        A.      Yes.

3        Q.      Are you aware of any debt collectors

4    that use ARS as part of their name or ARS as a

5    shortened name in the same way that ARS Account

6    Resolution Services uses ARS as a short name?

7        A.      Yes.  Yeah.

8        Q.      Do you recall who they are?

9        A.      I know there's an ARS National.

10        Q.      Okay.

11        A.      I don't know if they use the ARS alone.

12        Q.      Okay.  The last sentence of the next

13    paragraph, I'll read it aloud.  If you want to

14    take more time to look at it, it says, "And if one

15    ignores the warning an accesses the site, the

16    website begins tracking and storing information

17    about the computer user."  Do you see that?

18        A.      Yes.

19        Q.      To your knowledge, does -- if someone

20    accesses the ARS website, does it track and store

21    information about that user?

22        A.      I believe so.

23              MR. STERN:  Let's take a break.  I may

24        be done.  If I have anymore questions it's a

25        couple follow ups.

**Exhibit 1**        **page 170 of 183**

- David Friedlander -

Page 171

1      (Whereupon there was a recess in the
2      proceedings from 4:39 to 4:45 p.m.)
3  BY MR. STERN:
4      Q.    The accounts which -- it's a followup
5  question to something we talked about earlier
6  today.  You explained there are -- that the
7  billing customers, I think you said of HCFS, and
8  you referred to OSB clients.
9      A.    Yes.
10      Q.    Those are the entities that would be
11  referring -- placing accounts with HRRG and/or the
12  ARS business unit; am I right?  Did I get that
13  right?
14      A.    They are a small portion of clients
15  whose physicians may not be contracted with
16  TeamHealth -- contracted through TeamHealth.
17      Q.    Who is TeamHealth?
18      A.    The ultimate parent of HCFS.
19      Q.    But it's not a parent of -- obviously,
20  because you said there's no parent -- of HRRG?
21      A.    No.
22      Q.    But HRRG -- maybe in my question I may
23  have overemphasized the OSB client.  I meant was,
24  I was trying to generally describe the universe of
25  HRRG's clients.  And HRRG's clients, that would

**Exhibit 1**          **page 171 of 183**

- David Friedlander -

1    include HRRG and ARS?

2         A.    Yes.

3         Q.    Those clients are HCFS -- is it HCFS or

4    it's the billing customers of HCFS are included in

5    that group?

6         A.    Those are the customers of HCFS, the

7    billing customers.

8         Q.    Right.  Those billing customers are

9    HRRG clients?

10        A.    Yes.

11        Q.    Are there written contracts between

12   HRRG and those clients?

13        A.    No.

14        Q.    Is there any document, contract, or

15   agreement that governs the relationship between

16   HRRG and those clients?

17        A.    There may be with HCFS.

18        Q.    Does HRRG have a contract with HCFS?

19        A.    I don't think so.

20        Q.    Okay.  That's ultimately what I was

21   getting at, I wanted to know about contracts with

22   clients.

23             Is there someone at HRRG who is -- who

24   receives any complaints from -- before I ask that.

25   To be clear, when we refer to "customers," those

**Exhibit 1**                    **page 172 of 183**

- David Friedlander -

Page 173

```
 1   are the people who, according to your records, owe
 2   money; correct?  That's the term you used,
 3   "customers"?
 4        A.    We use consumers.
 5        Q.    Consumers, okay.  Is there an
 6   individual, or position, title of who oversees the
 7   complaints made by consumers about either the
 8   conduct of HRRG or ARS?
 9        A.    Are you asking about what agency
10   oversees consumer complaints?
11        Q.    Not what agency but --
12        A.    Or are you asking --
13        Q.    When HRRG receives a complaint from a
14   consumer, in this particular case by way of -- for
15   instance, in this case, you said you are the
16   person who is in charge of this case.  Is there --
17        A.    The respondents to complaints that are
18   received are the AVPs, the assistant
19   vice-presidents.
20        Q.    Who report directly to you?
21        A.    Yes.
22        Q.    Okay.  And is there one AVP for ARS?
23        A.    Yes.
24        Q.    Is there one or more for the non-ARS
25   HRRG work?
```

**Exhibit 1**          **page 173 of 183**

- David Friedlander -

Page 174

```
 1       A.    There were two.
 2       Q.    So one on the HRRG side and one on the
 3   ARS side?
 4       A.    No, two on the HRRG side.
 5       Q.    Okay.  And they handle -- that includes
 6   both formal complaints that they get served?
 7       A.    Yes.  They are handling complaints that
 8   come in the mail and complaints that come through
 9   the CFPB or the Better Business Bureau complaints.
10       Q.    But any complaints about your conduct?
11       A.    Yeah.  Nonlegal complaints.
12       Q.    Okay.
13       A.    Legal complaints are treated
14   differently.
15       Q.    How are legal complaints handled?
16       A.    Those are sent to the paralegal I
17   mentioned, Kim Durr, and she handles them.  She
18   notifies the appropriate people that there was a
19   legal complaint received.  She notifies our errors
20   and omissions insurance carrier.
21       Q.    Okay.  If you wanted to find out if
22   anyone has made a complaint about the phone
23   messages saying just the standing alone ARS, how
24   would you find that out?
25             MR. SCHEUERMAN:  You are talking
```

**Exhibit 1**            **page 174 of 183**

- David Friedlander -

1      informal complaint, or pleading, a lawsuit?

2           MR. STERN:  I'm talking about both.

3      All of them.

4      A.    I would go probably through Kim Durr

5   and ask her to look to see.

6      Q.    And have you done that in this case?

7   Let me withdraw that.  Don't answer that yet.

8           Are you aware of any complaints, formal

9   or otherwise, that have raised the claims that are

10   raised in this case?

11      A.    No.

12      Q.    Have you asked Kim Durr about whether

13   there are -- have been other cases?

14           MR. SCHEUERMAN:  I'm going to object.

15      Kim Durr is a paralegal.  She works for a

16      corporate attorney.  So to the extent you are

17      getting into what conversations you had,

18      that's protected by attorney-client

19      privilege.

20           MR. STERN:  I haven't asked what she

21      said.  I asked if he has made the inquiry,

22      that's all I --

23           MR. SCHEUERMAN:  You can ask that.  But

24      just so everyone is clear.

25      A.    I don't think I've asked Kim Durr

**Exhibit 1**          **page 175 of 183**

- David Friedlander -

Page 176

1    specifically that.

2         Q.    Okay.

3              MR. STERN:   Pass the witness.   Do you

4         have questions?

5              MR. SCHEUERMAN:   I have a couple follow

6         ups.

7    BY MR. STERN:

8         Q.    David, there are instances in which

9    debt collector representatives from the ARS wing

10   of the company have phone communications with

11   consumers, yes or no?

12        A.    Yes.

13        Q.    And do you classify those people as --

14   what do you call them, agents, debt collectors?

15        A.    I call them agents or representatives.

16        Q.    Okay.   And if you know, how -- when

17   there's an actual phone conversation, how are

18   those people trained to identify Account

19   Resolution Services on the telephone?

20        A.    They are trained to use ARS.

21        Q.    Again, this is just during phone calls.

22   What's the reason behind during a phone call just

23   using ARS?

24        A.    They are talking to consumers and

25   potentially non-consumers, so potentially people

**Exhibit 1**              **page 176 of 183**

- David Friedlander -

Page 177

1    who don't have accounts in collections.  And using

2    ARS doesn't disclose the nature of the call until

3    we have had a chance to identify that we are

4    speaking with an actual debtor.

5         Q.    Okay.  The telephone message that's

6    referenced in D-4, you were asked by counsel when

7    you first started using it.  You weren't able --

8    were not able to give a specific date.  But do you

9    have an approximation when that message was --

10   when the company started using that message?

11        A.    I could tell you approximately in -- I

12   think it's the message that we started using when

13   we first started calling on behalf of ARS.

14        Q.    Okay.  When was that?

15        A.    Around 2009.

16        Q.    Okay.  So you referenced -- when you

17   were talking about the vendor Genesis, you said

18   something that they do speech analytics software.

19   What exactly is that?  Can you explain that to me?

20        A.    It is software that is able to use

21   speech recognition and can analyze large volumes

22   of call conversations and put them into -- store

23   them in electronic file folders that can be

24   brought up through queries that we can --

25        Q.    That --

**Exhibit 1**          page 177 of 183

- David Friedlander -

```
 1      A.    So it makes the conversations more
 2   useable for training, quality assurance, and
 3   finding particular topics within the calls --
 4   within the call recordings.
 5      Q.    Do you have a quality control program
 6   where executives in the HRRG company listen to
 7   past recorded calls from agents?
 8      A.    Yes.
 9      Q.    Have you ever taken part in listening
10   to any past recorded calls relating to calls made
11   on behalf of ARS debts?
12      A.    Yes.
13      Q.    Okay.  What name is typically used by
14   those agents on the telephone when referring to
15   Account Resolution Services?
16      A.    They refer to it commonly as ARS.
17      Q.    Then you were asked a couple of times
18   with certain vendors -- strike that.
19           MR. SCHEUERMAN:  I have nothing
20        further.
21           MR. STERN:  I have some follow-up
22        things that your counsel asked you about.
23   BY MR. STERN:
24      Q.    If I understood, you said that the
25   agents are trained that when they are involved in
```

800-227-8440                                        973-410-4040

**Exhibit 1**              **page 178 of 183**

- David Friedlander -

Page 179

1    a live call that they just use ARS until they know
2    they are actually speaking with the debtor; is
3    that -- did I understand your testimony?  Is that
4    your testimony?
5         A.    Yes.
6         Q.    Once they -- I think earlier we talked
7    about -- when I was asking you, I think you
8    talked about a term you used was "right person."
9         A.    Yes.
10        Q.    Same meaning, right, the debtor?
11        A.    Right party identification.
12        Q.    That's right, you said right party not
13   right person.
14             Once the agent determines that they are
15   speaking to the right party, do they mention the
16   full name ARS Account Resolution Services anytime?
17        A.    Typically not.  They use ARS for the
18   most part.
19        Q.    Are there training manuals that govern
20   what this issue -- or training materials I should
21   say.  I don't want to limit it to manuals.  Any
22   kind of written materials about what name is to be
23   used in telephone conversations?
24        A.    There are.  There are memos that are
25   used, there are materials they access that are

**Exhibit 1**            **page 179 of 183**

- David Friedlander -

Page 180

1   electronic and stored in directories that are

2   accessible to staff.

3        Q.   Just to be clear, when we are talking

4   about agents, are we talking about only the agents

5   that work for the ARS business unit use those

6   terms, correct; in other words, used the term ARS

7   in their phone calls?

8        A.   Yes.  I'm talking specifically about

9   agents working on behalf of ARS.

10       Q.   Okay.  And the agents that -- the other

11  agents who work for HRRG don't refer to ARS at

12  all; correct?  Rephrase that.  Do they refer to

13  ARS -- withdrawn.

14            Do the agents employed by HRRG who are

15  not working for ARS receive any training on using

16  either ARS or ARS Account Resolution Services in

17  their telephone communications with consumers?

18       A.   No.

19       Q.   Were you involved in the creation or

20  approval of the script that was used to create the

21  message that was involved here?

22       A.   Yes.

23       Q.   What role -- you were not president at

24  the time, right?  Correct?

25            MR. SCHEUERMAN:  I'm sorry.  What --

- David Friedlander -

Page 181

1      objection to form.  Do you want me to have

2      him go out?  It's one word I'm going to use.

3            MR. STERN:  I'll rephrase the question.

4            MR. SCHEUERMAN:  Thank you.

5  BY MR. STERN:

6      Q.    I think you testified in response to

7  your counsel's question that the message that was

8  used here was a message that started being used in

9  2009; is that correct?

10     A.    Yes.

11     Q.    I thought you testified you had been

12 president for six years?

13     A.    2013 I think I became president.

14     Q.    So the last six years.  And prior to

15 that you were vice-president.  So you were

16 vice-president at the time that the message was

17 started to be used?

18     A.    Yes.

19     Q.    So what role did you play with respect

20 to either the development or approval of the

21 message?

22     A.    I worked with the assistant

23 vice-presidents in creating the message.

24     Q.    Who else was involved in creating the

25 message?

- David Friedlander -

Page 182

1        A.    I don't know that anyone else was

2    involved.

3        Q.    It was you and the assistant

4    vice-president?

5        A.    Yes.

6        Q.    Who was that assistant vice-president?

7        A.    I think at the time it was Judy

8    Oberman.

9        Q.    Can you spell the last name?

10       A.    O-B-E-R-M-A-N.

11       Q.    Is she still with HRRG?

12       A.    No.

13       Q.    Do you know where she is?

14       A.    She is not alive.  She passed away.

15             MR. STERN:  I have nothing further.

16             MR. SCHEUERMAN:  Neither do I.

17             COURT REPORTER:  Mr. Scheuerman, did

18    you want a copy?

19             MR. SCHEUERMAN:  Yes, ma'am.

20             (Time noted: 5:50 p.m.)

21

22

23

24

25

**Exhibit 1**          **page 182 of 183**

- David Friedlander -

Page 183

1                C E R T I F I C A T E

2

3

4          I, Kathleen Swenor, do hereby certify

5    that prior to the commencement of the examination,

6    DAVID FRIEDLANDER, was duly sworn by me to tell

7    the truth, the whole truth, and nothing but the

8    truth.

9          I do further certify that the foregoing

10   is a true and accurate transcript of the testimony

11   as taken stenographically by and before me at this

12   time, place and date hereinbefore set forth.

13         I do further certify that I am neither

14   a relative nor employee nor attorney nor counsel

15   of any of the parties to this action, and that I

16   am neither a relative nor employee of such

17   attorney or counsel, and that I am not financially

18   interested in the action.

19

20

21

22

23            Kathleen Swenor, RPR, CCR

24

25

**Exhibit 1**              **page 183 of 183**